IN THE MATTER OF LEE ANN GRADY.

Argued September 8, 1980—Decided February 18, 1981.

236

238

*Herbert D. Hinkle*, Deputy Public Advocate, argued the cause for appellant Public Advocate (*Stanley C. Van Ness*, Public Advocate, attorney; *Herbert D. Hinkle* and *Nancy J. Geltman*, Assistant Deputy Public Advocate, on the brief).

*Andrea M. Silkowitz*, Deputy Attorney General, argued the cause for respondent Attorney General (*John J. Degnan*, Attorney General of New Jersey, attorney; *Michael R. Cole*, Assistant Attorney General, of counsel).

*Richard Kahn*, Guardian *Ad Litem*, argued the cause for respondent Lee Ann Grady (*Richard Kahn*, attorney; *Richard Kahn* and *John T. Byrnes, Jr.*, on the briefs).

*William T. Cooper* argued the cause for respondents Edward and Luanne Grady.

*Cynthia M. Jacob* submitted a brief on behalf of *amicus curiae* Mental Health Law Project (*Norris, McLaughlin & Marcus,* attorneys; *Michael S. Lottman,* a member of the Alabama bar and *Judith E. Cohn,* a member of the District of Columbia bar, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

As once before in *In re Quinlan,* 70 *N.J.* 10, *cert.* denied, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.2d* 289 (1976), we again examine a disturbing paradox: how we can preserve the personal freedom of one incapable of exercising it by allowing others to make a profoundly personal decision on her behalf. In *Quinlan* this Court held that a comatose person kept alive by extraordinary means shall have a guardian appointed who would decide whether to discontinue those means. The question now before us is closely related: under what conditions should a court appoint a guardian who may authorize the sterilization of a woman who is severely mentally impaired.

## I

### Facts

Lee Ann Grady is a 19-year-old mentally impaired woman seriously afflicted with Down's syndrome.[1] Within a few days of her birth, Lee Ann's parents decided not to place her in an

---

[1] Lee Ann Grady was born in 1961, the first child of Edward and Luanne Grady. At birth she suffered from a chromosomal disorder known as trisomy 21. The nuclei of the cells in her body contain 47 rather than the usual 46 chromosomes. This disorder is not extremely rare. Various reports estimate its incidence as one in about 600 to 1,000 live births. The victim of trisomy 21 manifests certain physical characteristics as well as mental and developmental disabilities. Together they are called Down's syndrome. Lee Ann's disabilities include severe mental impairment.

The American Association of Mental Deficiency gives the following definition of mental retardation:

Mental retardation refers to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior, and

institution but to care for her at home. Since that time they have provided her with love and emotional support, as well as the physical necessities of life. Together with her parents, Lee Ann lives with a younger brother and sister who also treat her affectionately.

Her formal education has consisted of special programs within the public schools. Over the years she has been tested by school personnel, who have recommended that she continue to participate in the special classes. Although unable to read words, she does recognize the letters of the alphabet. She has moderate success in writing her name. She has some ability to count low numbers, but it is not clear whether she counts by rote or with awareness of the function of numbers. In her conversation she often fails to form complete sentences.

At home Lee Ann's activities include playing simple games, watching television, and taking short walks. She is capable of performing tasks such as folding laundry and dusting. She can dress herself, but she cannot select clothes appropriate for the season or matching in color. She is able to bathe herself but needs help regulating the temperature of the water. She can open and warm a can of soup but has difficulty in controlling the heat of the stove burner. Her physical limitations have kept her from learning to ride a bicycle, to catch a ball or to jump rope. But she goes bowling occasionally, and she likes to swim.

Because Lee Ann does not suffer from some of the physical ailments associated with Down's syndrome, her life expectancy is about normal. Her physical maturation has not deviated significantly from that of other adolescents. While some of her

---

manifested during the developmental period. [P. Chinn, C. Drew, & D. Logan, *Mental Retardation—A Life .Cycle Approach* 4 (1975); P. Friedman, *The Rights of Mentally Retarded Persons* 13 (1976); D. Sellin, *Mental Retardation—Nature, Needs, and Advocacy* 3 (1979)]

Mental impairment results in widely different degrees of disability. They are often grouped into categories termed mild, moderate, severe and profound. *See generally* D. Sellin, *supra*, at 9–17; C. Cleland, *The Profoundly Mentally Retarded* 3–4 (1979).

external features identify her as a person born with Down's syndrome, her parents and others see her as an attractive young woman. Her mood is often jovial and friendly.

Although in a physical sense her sexual development has kept pace with that of others her age, Lee Ann's severe mental impairment has prevented the emotional and social development of sexuality. She has no significant understanding of sexual relationships or marriage. If she became pregnant, she would neither understand her condition nor be able to make decisions about it. Her lack of awareness could lead to severe health problems. It is uncontradicted that she would not be able to care for a baby alone. Indeed, she will probably need lifetime supervision to care for her own needs.

Recognizing her sexual growth, the Gradys have provided birth control pills for Lee Ann during the past four years. Although there is no evidence that Lee Ann has engaged in sexual activity or has any interest in doing so, her parents believe that contraception is an appropriate precaution to exercise under the circumstances of their daughter's life.

As Lee Ann has approached the age of 20—when she will leave her special class in the public school system—the Gradys have given more thought to her future. The parents fear they will predecease their daughter and she will be unable to live independently. Thus they have sought to attain for her a life less dependent on her family. The Gradys wish to place Lee Ann in a sheltered work group and eventually in a group home for retarded adults. But the parents see dependable and continuous contraception as a prerequisite to any such change in their daughter's environment. With the advice of their doctor, they sought to have Lee Ann sterilized at Morristown Memorial Hospital. The hospital refused to permit the operation.

## II

### The Opinion Below

The Gradys requested such authorization from the Superior Court, Chancery Division. They sought appointment of a special

guardian with authority to consent on Lee Ann's behalf to a conventional sterilization procedure known as a tubal ligation. The hospital responded that it could not legally permit the operation without judicially authorized consent for Lee Ann. Soon after the complaint was filed, Judge Polow, the trial judge, appointed a guardian *ad litem* to represent Lee Ann's interests in the judicial proceedings. He also permitted the intervention of the Public Advocate and the Attorney General to represent the interests of the public and the State.

The court received several medical and educational reports about Lee Ann's condition and abilities. There was also testimony from Mr. Grady and several experts called by various parties and the court itself. Judge Polow met briefly with Lee Ann in counsel's office to get a first-hand impression of her condition. Lee Ann was not otherwise present at the judicial proceedings. Her only participation was in interviews for the medical and psychological examinations which were the bases of the expert evaluations.

None of the parties contended that the court should not authorize sterilization under any circumstances. The contested issues involved the standards the court should apply before deciding to authorize sterilization and whether Lee Ann's situation met those standards. After considering all the evidence, Judge Polow rendered judgment allowing the parents to exercise substituted consent for Lee Ann to be sterilized.

In a thoughtful opinion, 170 *N.J.Super.* 98 (Ch.Div.1979), Judge Polow began by reviewing the constitutional objections raised against compulsory eugenic sterilization. He then recognized the relationship between the right to consent to sterilization and the constitutional right of privacy found in the contraception and abortion cases. The trial judge thus perceived a conflict between two fundamental rights: the right to be free from involuntary sterilization and the right to obtain sterilization.

He proceeded to consider two New Jersey statutes, *N.J.S.A.* 30:4–24.2(d)(2) and 30:6D–5(a)(4), which protect the rights of

mentally retarded persons.   Concluding that the statutes were inapplicable here, Judge Polow instead found power to authorize substituted consent for sterilization in the inherent *parens patriae* jurisdiction of the Chancery Court.   As to the exercise of that power, the judge set a five-part standard:

> [B]efore this court may exercise its inherent power to grant this application the following conditions must exist:
>
>   1.   That the subject is incapable of understanding the nature of the sexual function, reproduction or sterilization and cannot comprehend the nature of these proceedings, hence is incompetent;
>
>   2.   That such incompetency is in all likelihood permanent;
>
>   3.   That the incompetent is presumably not infertile and not incapable of procreation;
>
>   4.   That all procedural safeguards have been satisfied, including appointment of a guardian *ad litem* to act as counsel for the incompetent during court proceedings, with full opportunity to present proofs and cross-examine witnesses;
>
>   5.   That the applicants have demonstrated their genuine good faith and that their primary concern is for the best interests of the incompetent rather than their own or the public's convenience.
>
> [170 *N.J.Super.* at 125–26.   (footnote omitted)]

Finding that these conditions had been met, he granted the parents' application.

The Public Advocate and the Attorney General appealed, while both the parents and the guardian *ad litem* sought an affirmance.   Before argument, we granted the guardian *ad litem*'s motion for direct certification.   84 *N.J.* 389 (1980).

Although we agree with much of the trial court opinion, the standard we establish today for judicial authorization of sterilization differs from that applied by the trial court.   Therefore, we vacate the judgment of the Superior Court, Chancery Division, and remand for application of the new standard to the facts of this case.

## III

### The Right to Obtain Sterilization

We are well aware that the decision before us is awesome. Sterilization may be said to destroy an important part of a

person's social and biological identity—the ability to reproduce. It affects not only the health and welfare of the individual but the well-being of all society. Any legal discussion of sterilization must begin with an acknowledgment that the right to procreate is "fundamental to the very existence and survival of the race." *Skinner v. Oklahoma*, 316 *U.S.* 535, 541, 62 *S.Ct.* 1110, 1113, 86 *L.Ed.* 1655 (1942). This right is "a basic liberty" of which the individual is "forever deprived" through unwanted sterilization. *Id.*

A court must take particular care to protect the rights of the mentally impaired when considering the prospect of sterilization. Those rights have recently received increased attention from public authorities in this country. *See, e. g.*, 42 *U.S.C.A.* § 6000 *et seq.; N.J.S.A.* 30:4–24 to –24.3 and 30:6D–1 *et seq.*; Joint Mental Health Subcommittee of the Senate and Assembly Institutions, Health and Welfare Committees, *Final Report to the Legislature* (1975); *cf. Parham v. J. R.*, 442 *U.S.* 584, 99 *S.Ct.* 2493, 61 *L.Ed.2d* 101 (1979) (due process requirements of state commitment procedures). After a history of isolation and neglect, the mentally retarded members of our society are finally being accorded their basic civil rights. *See generally* F. de la Cruz & G. LaVeck (eds.), *Human Sexuality and the Mentally Retarded* 145–46 (1973); P. Friedman, *The Rights of Mentally Retarded Persons* (1976).

It cannot be forgotten, however, that public attitudes toward mental impairment and the handicapped in general have sometimes been very different. We must always remain mindful of the atrocities that people of our own century and culture have committed upon their fellow humans. We cannot adequately express our abhorrence for the kind of ideology that assigns vastly differing value to the lives of human beings because of their innate group characteristics or personal handicaps.

Sterilization has a sordid past in this country—especially from the viewpoint of the mentally retarded. In the early part of

this century many states enacted compulsory sterilization laws as an easy answer to the problems and costs of caring for the misfortunate of society. Lawmakers may have sincerely believed that the social welfare would improve if fewer handicapped people were born, but they were too quick to accept unproven scientific theories of eugenics.[2] In the United States Supreme Court, a compulsory sterilization law withstood a challenge that such legislation unconstitutionally infringes upon liberty protected by the due process clause. In *Buck v. Bell,* 274 *U.S.* 200, 47 *S.Ct.* 584, 71 *L.Ed.* 1000 (1927), the Court upheld a law authorizing the compulsory sterilization of a mentally impaired woman for no more compelling reason than to prevent another generation of "imbeciles." Compulsory, eugenic sterilization would have to overcome much higher constitutional hurdles today. *See* Note, *Eugenic Sterilization Statutes: A Constitutional Re-Evaluation,* 14 *J.Fam.L.* 280 (1975).

Half a century later, we have serious doubts about the scientific validity of eugenic sterilization, *see North Carolina Ass'n for Retarded Children v. North Carolina,* 420 *F.Supp.* 451, 454 (M.D.N.C.1976); Note, *Eugenic Sterilization—A Scientific Analysis,* 46 *Den.L.J.* 631 (1969); Ferster, *Eliminating the Unfit—Is Sterilization the Answer?,* 27 *Ohio St.L.J.* 591, 602–04 (1966), as

---

[2]The originator of the term "eugenics" defined it as "the study of agencies under social control that may improve or impair ... future generations either physically or mentally." Ferster, *Eliminating the Unfit—Is Sterilization the Answer?,* 27 *Ohio St.L.J.* 591 (1966).

[T]he eugenics movement ... had a two-fold aim: (1) positive eugenics—encouragement of the propagation of the biologically fit and (2) negative eugenics—discouragement of the reproduction of inferior stock.... The proponents ... decided that mental illness, mental retardation, epilepsy, criminality, pauperism and various other defects were hereditary. Considerable agitation for corrective action was based upon the premise that these various conditions were hereditary. Since attempts at cure were considered futile for hereditary defects, measures which would prevent reproduction by "the unfit" appeared to be the only way to eliminate these conditions. [*Id.* at 592]

well as its morality.[3]  Yet compulsory sterilization is not alto-gether part of the past.  Many of our sister states have not abandoned their compulsory sterilization laws.  *See* Note, *supra,* 14 *J.Fam.L.* at 304–08;  Ferster, *supra,* 27 *Ohio St.L.J.* at 626–33. Nothing we say today should be interpreted as approval of compulsory sterilization *for any purpose.*

The case before us presents a situation that is difficult to characterize as either "compulsory" or "voluntary."  "Compulso-ry" would refer to a sterilization that the state imposes despite objections by the person to be sterilized or one who represents his interests.  Here, however, Lee Ann's parents and her guardi-an *ad litem* all agree that sterilization is in her best interests, and while the state may be acting in the constitutional sense, it would not be compelling sterilization.  Lee Ann herself can comprehend neither the problem nor the proposed solution; without any such understanding it is difficult to say that sterili-zation would be against her will.  Yet for this same reason, the label "voluntary" is equally inappropriate.  Since Lee Ann is without the capacity for giving informed consent, any explana-tion of the proposed sterilization could only mislead her.  Thus, what is proposed for Lee Ann is best described as neither "compulsory" nor "voluntary," but as lacking personal consent because of a legal disability.

Having created this third category—sterilization which is neither voluntary nor compulsory—we must now give it content. Since analogy is the vessel that carries meaning from old to new in the law, we begin by considering the right to obtain steriliza-tion voluntarily.  We believe that an individual's constitutional right of privacy includes the right to undergo sterilization voluntarily.  Beginning with *Griswold v. Connecticut,* 381 *U.S.*

---

[3]We flatly reject continued efforts in recent times to justify compulsory sterilization for eugenics or population control purposes. *See* Gray, *Compulsory Sterilization in a Free Society,* 41 *U.Cinn.L.Rev.* 529 (1972); Vukowich, *The Dawning of the Brave New World—Legal, Ethical, and Social Issues of Eugenics,* 1971 *U.Ill.L.Forum* 189.

479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965), the United States Supreme Court has given constitutional recognition to personal autonomy over procreation and contraception. In *Griswold,* the Court sought to preserve the right of privacy in marriage against governmental intrusion in the form of a law forbidding the use of contraceptives. To shield that right from governmental interference, it forged substantive rights of privacy out of the "penumbras" of the Bill of Rights. See *id.* at 484, 85 *S.Ct.* at 1681.

In *Eisenstadt v. Baird,* 405 *U.S.* 438, 92 *S.Ct.* 1029, 31 *L.Ed.*2d 349 (1972), the Court extended the right to use contraceptives to all individuals, rather than restricting it to married couples. Thus *Eisenstadt* proclaimed a right to prevent conception which complements the fundamental right to procreate recognized in *Skinner v. Oklahoma, supra.*

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. [405 *U.S.* at 453, 92 *S.Ct.* at 1038]

Any remaining doubt about a personal right to prevent conception has been put to rest. *See Carey v. Population Services Int'l,* 431 *U.S.* 678, 97 *S.Ct.* 2010, 52 *L.Ed.*2d 675 (1977); *Planned Parenthood of Missouri v. Danforth,* 428 *U.S.* 52, 96 *S.Ct.* 2831, 49 *L.Ed.*2d 788 (1976).

The recent cases invalidating restrictions on abortion further expanded the right to control one's own body. *Doe v. Bolton,* 410 *U.S.* 179, 93 *S.Ct.* 739, 35 *L.Ed.*2d 201 (1973); *Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973); *cf. Doe v. Bridgeton Hospital Ass'n,* 71 *N.J.* 478 (1976), *cert. denied,* 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977) (private, non-sectarian hospitals could not refuse to permit their facilities to be used for elective abortions). Their thrust is unmistakable when considering whether the constitutional right of privacy includes the right to be sterilized.

A right to sterilization has yet to receive express constitutional protection from the United States Supreme Court. Several

lower courts, however, have acknowledged its existence. *Hathaway v. Worcester City Hospital*, 475 *F.2d* 701 (1st Cir. 1973); *Ruby v. Massey*, 452 *F.Supp.* 361 (D.Conn.1978); *Peck v. Califano*, 454 *F.Supp.* 484 (D.Utah 1977); *Ponter v. Ponter*, 135 *N.J.Super.* 50, 55 (Ch.Div.1975) (holding that a married woman has "a constitutional right to obtain a sterilization operation without the consent of her husband").

The right to be sterilized also derives from the rationale of our decision in *In re Quinlan, supra*. There we held that a person has a constitutional right to discontinue use of artificial life-sustaining apparatus when the prognosis for returning to cognitive or sapient life is dim. Our holding grew out of a belief that, under some circumstances, an individual's personal right to control her own body and life overrides the state's general interest in preserving life. A decision to be sterilized is also a part of an individual's personal right to control her own body and life. The state's interest in procreation cannot be greater than its interest in preserving life. If one can decide to forgo artificial life-preservation and thereby sacrifice life, then one can certainly decide to forgo reproductive capacity and thereby relinquish the ability to procreate. Therefore, the right to be sterilized is included in the privacy rights protected by the federal Constitution.

We observe briefly that the right of privacy is protected as well by our State Constitution. *N.J.Const.* (1947), Art. I, par. 1; *see State v. Saunders*, 75 *N.J.* 200 (1977); *In re Quinlan, supra*. We have not expounded the scope of that right, as contrasted with the federal right of privacy, because our previous decisions have found the federal right sufficient to dispose of the issues presented. *But cf. Saunders, supra*, (Schreiber, J., concurring) (fornication statute violates right of privacy under State, not federal, Constitution). Nor do we do so now except to note, as we did in *Saunders*, that governmental intrusion into privacy rights may require more persuasive showing of a public interest under our State Constitution than under the federal Constitution. 75 *N.J.* at 217. Thus, we also find that the right to be

sterilized comes within the privacy rights protected from undue governmental interference by our State Constitution. Such a choice that bears so vitally upon a matter of deep personal privacy may also be considered an integral aspect of the "natural and unalienable" right of all people to enjoy and pursue their individual well-being and happiness. *See N.J.Const.* (1947) Art. I, par. 1.[4]

## IV

### *The Right of Meaningful Choice*

█ Having recognized that both a right to be sterilized and a right to procreate exist, we face the problem, as in *Quinlan*, that Lee Ann Grady is not competent to exercise either of her constitutional rights. What is at stake is not simply a right to obtain contraception or to attempt procreation. Implicit in both these complementary liberties is the right to make a meaningful choice between them. Yet because of her severe mental impairment, Lee Ann does not have the ability to make a choice between sterilization and procreation, or between sterilization and other methods of contraception—a choice which she would presumably make in her "best interests" had she such ability. But her inability should not result in the forfeit of this constitutional interest or of the effective protection of her "best interests." If the decision whether or not to procreate is "a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice." *Quinlan, supra,* at 41. To preserve that right and the benefits that a meaning-

---

[4]Natural and unalienable rights

    1. All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

ful decision would bring to her life, it may be necessary to assert it on her behalf.

We need not determine here the full range of persons who may assert such a right on behalf of the incompetent. The parents are unquestionably eligible to do so. The question of who besides the parents has standing to represent the purported interests of the incompetent can await future determination. Nevertheless, we believe that an appropriate court must make the final determination whether consent to sterilization should be given on behalf of an incompetent individual. It must be the court's judgment, and not just the parents' good faith decision, that substitutes for the incompetent's consent.[5] To the extent that the trial court held otherwise, we disagree.

We realize that this holding is a departure from *Quinlan*. In *Quinlan* we found that the only practical way to preserve the comatose patient's right to discontinue artificial life-support was to allow the guardian and family "to render their best judgment, subject to . . . qualifications . . ., as to whether she would exercise it in these circumstances." 70 *N.J.* at 41. But Quinlan concerned a very special situation. The alternatives available there were much more clear-cut than those here. The patient could continue to live indefinitely in a coma with the support of artificial apparatus or she could have the apparatus removed and allow natural forces to take over, probably resulting in her death. This choice is not conducive to detached evaluation and resolution by the person exercising it in behalf of the patient. A decision to choose life or death will rely on instinct more than reasoned calculation. Other than considering the medical opinions to determine the chances of the patient's future recovery, there are few factors for a court to weigh in deciding what is in the incompetent's best interest. The Court in *Quinlan* thought

---

[5]We do not mean that the trial judge must sign the consent form. Procedurally, the trial court should designate a guardian with authority to consent, as was done here. We only wish to point out the reality that the substance of the consent comes from the court rather than the guardian personally.

it best to defer to the parents' judgment as long as safeguards were observed. Also, the Court was not made aware in that case of any history of abuse in such decisions.

In contrast, sterilization of incompetents, especially the mentally impaired, has been subject to abuse in the past. See Ferster, *supra*, 27 *Ohio St.L.J.* at 592–94; Burgdorf & Burgdorf, *The Wicked Witch Is Almost Dead*, 50 *Temple L.Q.* 995 (1977). We must ensure that the law does not allow abuse to continue. Since the sterilization decision involves a variety of factors well suited to rational development in judicial proceedings, a court can take cognizance of these factors and reach a fair decision of what is the incompetent's best interest.

Our courts routinely make such decisions in adoption and child custody cases. See, *e. g., Hoy v. Willis*, 165 *N.J.Super.* 265 (App.Div.1978); *Vannucchi v. Vannucchi*, 113 *N.J.Super.* 40 (App.Div.1971); *In re Adoption of B.*, 152 *N.J.Super.* 546 (Cty. Ct.1977). Although we do not equate sterilization of incompetents with adoption or child custody, we think it sufficiently analogous to warrant close supervision by our courts. All three affect important aspects of an individual's personal and family life, and all three entail serious and permanent consequences. Independent judicial decision making is the best way to protect the rights and interests of the incompetent and to avoid abuses of the decision to sterilize.

Our discussion thus far leads to the following conclusions. The right to choose among procreation, sterilization and other methods of contraception is an important privacy right of all individuals. Our courts must preserve that right. Where an incompetent person lacks the mental capacity to make that choice, a court should ensure the exercise of that right on behalf of the incompetent in a manner that reflects his or her best interests.

We next turn to the specific issues before the Court.

## V

### *The Statutes*

The Public Advocate and the Attorney General contend that the Legislature has established statutory standards governing the sterilization of mentally impaired persons in this State. They argue that *N.J.S.A.* 30:4–24.2(d)(2) and 30:6D–5(a)(4) apply to this request for authorization from Lee Ann's parents. If those statutes do apply, the hearing must comply with certain prescribed procedures, including the physical presence of the incompetent person. Furthermore, the person requesting sterilization must prove its necessity. Because Lee Ann was not present at the hearing and her parents did not prove the necessity for sterilization, the Public Advocate and Attorney General contend the judgment authorizing consent to sterilization should be vacated and the case remanded.

The trial judge found that neither statute directly governs the present proceedings. We agree.

*N.J.S.A.* 30:4–24.2 is part of amendatory legislation popularly known as the "Bill of Rights for the Mentally Retarded." It was enacted in 1975 as an addition to our laws governing commitment and admission of patients into State or county institutions for the care and treatment of the mentally retarded. *See N.J.S.A.* 30:4–23 to –79.

*N.J.S.A.* 30:4–24.2(d) provides in relevant part:

d. Each patient in treatment shall have the following rights, a list of which shall be prominently posted in all facilities providing such services and otherwise brought to his attention by such additional means as the department may designate:

\*    \*    \*    \*    \*    \*    \*    \*

(2) Not to be subjected to experimental research, shock treatment, psychosurgery or sterilization, without the express and informed consent of the patient after consultation with counsel or interested party of the patient's choice. Such consent shall be made in writing, a copy of which shall be placed in the patient's treatment record. If the patient has been adjudicated incompetent a court of competent jurisdiction shall hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine

all witnesses alleging the necessity of such procedures. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedures. In the event that a patient cannot afford counsel, the court shall appoint an attorney not less than 10 days before the hearing. An attorney so appointed shall be entitled to a reasonable fee to be determined by the court and paid by the county from which the patient was admitted. Under no circumstances may a patient in treatment be subjected to experimental research which is not directly related to the specific goals of his treatment program.

■ The words "patient" and "institution" are defined in *N.J.S.A.* 30:4–23:

"Patient" includes any person or persons alleged to be mentally ill, tuberculous, or mentally retarded whose admission to any institution for the care and treatment of such class of persons in this State has been applied for.

\* \* \* \* \* \* \* \*

"Institution," includes, except as herein otherwise provided, any State or county institution for the care and treatment of the mentally ill, the tuberculous, or the mentally retarded in this State, as the case may be.

These definitions, as well as the overall structure of the legislation, strongly suggest that the statute applies only to public institutions that provide care and treatment primarily for the mentally ill, tuberculous or mentally impaired. While residence at such an institution is not a prerequisite for application of the statute, it applies only when its terms cover the institution in question.

■ The statutory language itself calls for this construction. *N.J.S.A.* 30:4–24 provides in part:

The provisions of this Title shall govern the admission and commitment of the mentally ill, tuberculous, and mentally retarded *to the several institutions designated therefor* and govern and control all phases of the relationship between such patients and such institutions. . . . [emphasis added]

We agree with the trial judge's ruling that "the Legislature did not intend Morristown Memorial Hospital as an institution within the meaning of the statute simply because it includes among its patients, for general medical services, mentally retarded persons." 170 *N.J.Super.* at 114.

■ The second relevant statute, *N.J.S.A.* 30:6D–5(a)(4) provides:

a. No person receiving services for the developmentally disabled *at any facility* shall:

\* \* \* \* \* \* \* \*

(4) be subjected to shock treatment, psycho-surgery, sterilization or medical behavioral or pharmacological research without the express and informed consent of such person, if a competent adult, or of such person's guardian ad litem specifically appointed by a court for the matter of consent to these proceedings, if a minor or an incompetent adult or a person administratively determined to be mentally deficient. Such consent shall be made in writing and shall be placed in such person's record.

Either the party alleging the necessity of such procedure or such person or such person's guardian ad litem may petition a court of competent jurisdiction to hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine all witnesses alleging the necessity of such procedure. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedure. In the event that a person cannot afford counsel, the court shall appoint an attorney not less than 10 days before the hearing. An attorney so appointed shall be entitled to a reasonable fee to be determined by the court and paid by the county from which the person was admitted. Under no circumstances may a person in treatment be subjected to hazardous or intrusive experimental research which is not directly related to the specific goals of his treatment program. [emphasis added]

It is apparent that much of the language in this subsection is repeated from *N.J.S.A.* 30:4–24.2(d)(2), which was enacted two years earlier. Although we hold that the earlier statute applies only to institutions whose primary or substantial function is to care for and treat the mentally impaired, our inquiry into the scope of the latter statute is not at an end.

The Public Advocate and Attorney General argue that the Legislature intended to protect the rights of all mentally impaired persons within the State and that the statute should therefore be given a broad reading. By virtue of her attendance at a special education class in a public school, they contend Lee Ann receives "services" at a "facility" and thus is entitled to the protections of *N.J.S.A.* 30:6D–5(a)(4). The trial judge disagreed, holding that the public school is not a "facility" within the meaning of the statute.

*N.J.S.A.* 30:6D–5(a)(4) is part of the Developmentally Disabled Rights Act. *N.J.S.A.* 30:6D–1 to –12, *L.* 1977, *c.* 82. This legislation was enacted in 1977 largely as a response to a federal funding act designed to aid the states in providing improved health services for mentally impaired persons and persons with

other developmental disabilities. 42 *U.S.C.A.* § 6001 *et seq.* (1977). As a condition for receipt of federal assistance, Congress mandated that the states protect and advocate the individual rights of persons with developmental disabilities. 42 *U.S.C.A.* § 6012 (1977). The act itself expressly recognized certain general rights of the disabled. *See* 42 *U.S.C.A.* § 6010 (1977).

To comply with the congressional mandate, the State Legislature enacted the Developmentally Disabled Rights Act. *See* Senate Institutions, Health and Welfare Committee Statement to *L.* 1977, *c.* 82. As stated earlier, some of the provisions of the act came from our own earlier legislation. These portions went further than the federal act in enumerating the rights of the developmentally disabled. Compare *N.J.S.A.* 30:6D–4, –5 *with* 42 *U.S.C.A.* § 6010 (1977). Other portions came directly from the federal act. Thus the definitions in *N.J.S.A.* 30:6D–3 are almost identical to those in the federal statute, 42 *U.S.C.A.* § 6001 (1977).

"Facility" is defined in the State statute as: "a facility operated by any public or private agency, organization or institution for the provision of services for persons with developmental disabilities." *N.J.S.A.* 30:6D–3(c). "Services" is defined as:

specialized services or special adaptations of generic services provided by any public or private agency, organization or institution and directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with such a disability; and such term includes diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, training, education, sheltered employment, recreation, counseling of the individual with such disability and of his family, protective and other social and sociolegal services, information and referral services, follow-along services, and transportation services necessary to assure delivery of services to persons with developmental disabilities. [*N.J.S.A.* 30:6D–3(b)]

While a literal interpretation of these definitions might include the services rendered through the special education program of a public school, we agree with the trial judge that the Legislature did not intend such a result. The Committee Statement accompanying the act states:

The provisions of this bill apply to persons in residence or attendance at any public or private facility for the developmentally disabled.

We discern in this statement an intention to restrict the act's scope to institutions whose primary purpose is to provide the "special services" described in *N.J.S.A.* 30:6D–3(b) to disabled persons. According to this view, a public school is not a "facility for the developmentally disabled." It is a general facility for children which may also offer programs for the developmentally disabled. We do not believe that in enacting the Developmentally Disabled Rights Act the Legislature intended to encompass all facilities which might incidentally provide services or programs to the developmentally disabled. If that were the case, there would be no need for the act to focus on facilities as opposed to services. Consistent with well-established canons of statutory construction, we decline to interpret a statutory scheme so as to render a portion of it superfluous. *See, e. g., In re Toms River Water Co.,* 82 *N.J.* 201, 211 (1980). As the trial judge said, "[the statute] could only have been intended to apply to residents or outpatients 'admitted' to state or private institutions or facilities for the developmentally disabled." 170 *N.J.Super.* at 116.

Other provisions of the statute support this interpretation. The act enumerates a list of rights for the disabled person, including the rights to practice a religion of his choice, to send and receive correspondence, to use a telephone in privacy, and to see visitors. *N.J.S.A.* 30:6D–4. These rights have little significance within the environment of a public school. Similarly, the subsection protecting the developmentally disabled person against unwanted sterilization also prohibits excessive medication, physical restraint and isolation, and corporal punishment, *see N.J.S.A.* 30:6D–5—measures which public schools are not authorized to administer.[6] Thus, the substance and structure of

---

[6]Our construction of the statute does not create a danger that developmentally disabled children will face abuses in the public schools because these statutes do not apply to their relationship with the schools. Conventional schools lack authority to impose treatment such as sterilization, shock treatment or psychosurgery. Nor do public schools administer significant

the statute imply that the Legislature did not intend it to cover schools or other institutions that serve the general population.[7]

We hold that neither *N.J.S.A.* 30:4–24.2 nor *N.J.S.A.* 30:6D–5 directly governs the application by Lee Ann's parents for authorization to have Lee Ann sterilized.

## VI

### *Inherent Judicial Authority*

Because the statutes are not applicable, we must consider whether they delineate the only circumstances in which sterilization of incompetents is permissible and thereby impliedly prohibit sterilization by court order in any other situations. The Public Advocate and the Attorney General contend that the Legislature meant to restrict judicial authorization of sterilization to the situations covered by the statutes. As the trial judge

---

amounts of medication or subject students to damaging physical restraint or isolation.

[7]Even if we found that the Developmentally Disabled Rights Act applied to public schools—that is, that public schools fell within the definition of "facility"—we do not believe that the statute would control the *parents'* behavior toward the disabled child. The scheme governs only the relationship of the "facility" with the child. The Committee Statement observes:

> The bill also prohibits *a facility* from employing corporal punishment; the use of medication except where necessary and appropriate as an element of the treatment being provided, any restraint or isolation,except in certain violent situations; and the administration of any shock treatment, psychosurgery, sterilization or medical or clinical research without the express and informed consent of the person or such person's guardian ad litem. [emphasis added]

The statute would not apply where, as here, *the parents* seek sterilization. Otherwise, the act would severely restrict the manner in which parents could raise their child simply because they send him to a special education class in a public school. For instance, they would be prohibited by law from spanking him or sending him alone to his room—discipline which parents of other children are free to impose. The interpretation advocated by the Public Advocate and Attorney General would lead to such an anomalous result. We agree with the guardian *ad litem* that the Legislature did not intend to intrude upon the exercise of parental authority.

noted, such a restriction might raise equal protection issues by denying incompetent persons not covered by the statutes access to the courts to protect their fundamental right to be sterilized, *see supra* at 247–250. 170 *N.J.Super.* at 118; *see Boddie v. Connecticut,* 401 *U.S.* 371, 91 *S.Ct.* 780, 28 *L.Ed.2d* 113 (1971); *Ruby v. Massey,* 452 *F.Supp.* 361, 367–69 (D.Conn.1978). We need not address this question for we hold that the statutes do not restrict the authority of the courts. The inherent *parens patriae* jurisdiction of our Chancery Division is broad enough to encompass the decision whether consent for sterilization should be given by a court on behalf of a person who lacks the capacity to give or withhold consent for himself. We are in full agreement with Judge Polow's analysis of this issue and merely add a few observations to supplement it.

The *parens patriae* power of our courts derives from the inherent equitable authority of the sovereign to protect those persons within the state who cannot protect themselves because of an innate legal disability. *See* 67A *C.J.S., Parens Patriae* at 159 (1978). While traditionally used to protect the economic and property interests of the legally disabled, it has also been invoked to protect personal rights. *See* 27 *Am.Jur.2d* Equity § 69 (1966); *State in the Interest of R. G. W.,* 145 *N.J.Super.* 167, 182 (J.D.R.Ct.1976). In divorce and child custody cases, for example, our courts exercise *parens patriae* jurisdiction to protect the best interests of children. *Fantony v. Fantony,* 21 *N.J.* 525, 535 (1956); *Vannucchi v. Vannucchi,* 113 *N.J.Super.* 40, 46–47 (App.Div.1971); *E. v. T.,* 124 *N.J.Super.* 535, 541 (Ch.Div. 1973). The chancery courts also utilize their *parens patriae* powers when a juvenile has committed a criminal offense, *Johnson v. State,* 18 *N.J.* 422, 430 (1955), or when a person has been committed to a psychiatric institution, *State in the Interest of R. G. W., supra,* 145 *N.J.Super.* at 180.

*Parens patriae* jurisdiction has been invoked in cases involving substituted consent for medical procedures. The most common of these occurs when a court authorizes a blood transfusion over the objections of an injured or sick child's parents. *State v.*

*Perricone,* 37 *N.J.* 463, 475, *cert. denied,* 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.2d* 124 (1962); *Muhlenberg Hosp. v. Patterson,* 128 *N.J.Super.* 498 (Law Div.1974). Occasionally courts have authorized substituted consent for an incompetent adult to undergo medical treatment. *In re Schiller,* 148 *N.J.Super.* 168 (Ch.Div. 1977) (amputation of leg).

Two cases from outside the State have taken the equity powers of courts even further. In *Hart v. Brown,* 29 *Conn.Sup.* 368, 289 *A.2d* 386 (1972), the court permitted the parents of seven-year-old identical twins to consent to a kidney transplant from one twin to the other. In *Strunk v. Strunk,* 445 *S.W.2d* 145 (Ky.Ct.App.1969), the court authorized a kidney transplant from a 27-year-old incompetent man to his 28-year-old brother. Both courts authorized the operations after finding that the transplants would be in the best interests of the donor sibling. *Cf. In re Richardson,* 284 *So.2d* 185 (La.Ct.App.1973) (authorization for kidney transplant from 17-year-old mentally retarded donor denied because not in his best interests).

The most far-reaching exercise of *parens patriae* jurisdiction occurred in this Court five years ago. In *Quinlan, supra,* we authorized substituted consent by the parents of a comatose 22-year-old woman to discontinue use of extraordinary artificial life-support apparatus. We exercised our equitable powers there although we believed that our decision would probably lead to the natural death of the patient. Our decision took into consideration the interests of the public and the belief of our society in the supreme value of life. We were well aware of the risks of exercising powers directly affecting the opportunity of another human to live or die. But ultimately we decided that the patient's constitutional right of privacy outweighed the public interest in preserving her life and presented a compelling case for judicial intervention. Similar compelling considerations exist in the present case.

We are aware that the weight of authority is against us. Courts in several states have found that, without legislative

authorization, they lack power to grant the relief requested here. *Sparkman v. McFarlin*, 552 *F.*2d 172 (7th Cir. 1977), rev'd *sub nom. Stump v. Sparkman*, 435 *U.S.* 349, 98 *S.Ct.* 1099, 55 *L.Ed.*2d 331 (1978); *Wade v. Bethesda Hosp.*, 337 *F.Supp.* 671 (S.D.Ohio 1971); *Guardianship of Tulley*, 83 *Cal.App.*3d 698, 146 *Cal.Rptr.* 266 (1978), *cert.* denied, 440 *U.S.* 967, 99 *S.Ct.* 1519, 59 *L.Ed.*2d 783 (1979); *Guardianship of Kemp*, 43 *Cal.App.*3d 758, 118 *Cal.Rptr.* 64 (1974); *In re S. C. E.*, 378 *A.*2d 144 (Del.Ch. 1977); *A. L. v. G. R. H.*, 163 *Ind.App.* 636, 325 *N.E.*2d 501 (1975), *cert.* denied, 425 *U.S.* 936, 96 *S.Ct.* 1669, 48 *L.Ed.*2d 178 (1976); *Holmes v. Powers*, 439 *S.W.*2d 579 (Ky.Ct.App.1968); *In re M. K. R.*, 515 *S.W.*2d 467 (Mo.1974); *Application of A. D.*, 90 *Misc.*2d 236, 394 *N.Y.S.*2d 139 (Surr.Ct.1977), aff'd on other grounds, 64 *A.D.*2d 898, 408 *N.Y.S.*2d 104 (1978); *Frazier v. Levi*, 440 *S.W.*2d 393 (Tex.Civ.App.1969). In our view these decisions do not reflect adequate sensitivity to the constitutional rights of the incompetent person. We agree with the minority of courts that have found inherent power to decide these issues. *In re Sallmaier*, 85 *Misc.*2d 295, 378 *N.Y.S.*2d 989 (Sup.Ct.1976); *In re Hayes*, 93 *Wash.*2d 228, 608 *P.*2d 635 (1980).

As we stated earlier, Lee Ann Grady has the same constitutional right of privacy as anyone else to choose whether or not to undergo sterilization. Unfortunately, she lacks the ability to make that choice for herself. We do not pretend that the choice of her parents, her guardian *ad litem*, or a court is her own choice. But it is a genuine choice nevertheless—one designed to further the same interests she might pursue had she the ability to decide herself. We believe that having the choice made in her behalf produces a more just and compassionate result than leaving Lee Ann with no way of exercising a constitutional right. Our Court should accept the responsibility of providing her with a choice to compensate for her inability to exercise personally an important constitutional right.

The trial court's reliance on *Quinlan, supra,* was not misplaced. We hold that our Chancery Division has inherent power under its *parens patriae* jurisdiction to decide whether to autho-

rize sterilization for incompetent persons such as Lee Ann Grady.

## VII

### *"Best Interests": Standards and Procedures*

We now consider the standards a court must apply in determining whether to authorize sterilization.

The Public Advocate demands a showing of necessity before sterilization of an incompetent person may be authorized. In his attempts to define the word "necessity," the Public Advocate emphasizes two factors: the likelihood that the incompetent person will be sexually active or become pregnant, and the availability of feasible, less drastic means of contraception. While both are relevant factors for consideration, a showing of strict necessity based upon them is not required.

The Public Advocate contends strict necessity is required because the State's interest in authorizing sterilization is limited to preventing the birth of genetically defective children and children whose parents are unable to provide adequate care. We disagree.[8] The State's interest is much broader. We are concerned here with the State's interest in *authorizing* sterilization when requested by the parents, not with any purported State interest in *compelling* sterilization. The exercise of *parens patriae* power is intended to compensate for an incompetent

---

[8]We also reject the Public Advocate's suggestion that the State's interest in preventing the birth of genetically defective or uncared for children is sufficient to necessitate the sterilization of anyone who does not want to be sterilized. In determining whether to authorize sterilization, a court should consider only the best interests of the incompetent person, not the interests or convenience of society in having the incompetent person sterilized. As we said earlier, nothing in this opinion should be read as approving compulsory sterilization. We therefore disagree with standards established in *North Carolina Ass'n for Retarded Children v. North Carolina*, 420 *F.Supp.* 451 (M.D.N.C.1976), and *In re Simpson*, 180 *N.E.2d* 206 (Ohio Prob.Ct.1962) (allowing sterilization of incompetents where it would serve public interests or the welfare of society as a whole).

person's inability to exercise her own constitutional rights concerning contraception. *See .supra* at 258–262. A standard of necessity would infringe too seriously upon these fundamental rights. We affirm the trial court's holding that *necessity* for sterilization need not be shown.[9]

Nevertheless, because of our overriding concern to prevent any abuse of judicial authority, we are compelled to establish a stricter standard than did the trial court. Although we substantially agree with the conditions set forth by Judge Polow, *see supra* at 258–262, it is necessary to modify and supplement those conditions.

---

[9]The concurring opinion misconstrues our position on a showing of necessity, a position that we have stated clearly. The potential for confusion is unfortunate, for both the majority and the concurrence seek to extend maximum protection to the rights of mentally impaired or other incompetent persons. We believe, however, that our position is more protective of those rights than either the concurrence or the State statutes discussed previously, *supra* at 253–258.

Our analysis is founded upon a fundamental concept—the right of every person to make a free choice about his reproductive capacity. Two principles derive from this: every person has a right to be sterilized if he wishes to be and no person will be sterilized if he does not wish to be. Despite Lee Ann's inability to exercise a free choice, she should be treated in a manner that does not deviate from these principles any more than the circumstances require.

A necessity standard would result in an unacceptable degree of State interference in the exercise of these rights concerning sterilization. It might prevent an individual who wishes to be sterilized from being so. Conversely, adoption of a necessity standard might also result in the imposition of sterilization upon someone against his wishes. If a showing of necessity were the only proof substantial enough to substitute for Lee Ann's inability to make a choice, such proof might also be substantial enough to substitute for a mistaken or imprudent choice not to be sterilized and thus justify compulsory sterilization. Necessity should not be accorded such talismanic powers.

As we said earlier, *supra* at 247, this application cannot be considered a request for compulsory sterilization. The standard we establish today, applicable where the person to be sterilized cannot make a choice for herself, gives maximum protection to the rights of that person by fulfilling both of the above basic principles derived from the fundamental right of reproductive autonomy.

First, it is ultimately the duty of the court rather than the parents to determine the need for sterilization. It is true that "the custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts*, 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.*2d 645 (1944). But the constitutional right of reproductive autonomy is a right personal to the individual. *Eisenstadt v. Baird, supra.* While the parents may advise a child and participate in his decision, that decision belongs to the child, not to his parents, *Bellotti v. Baird*, 443 *U.S.* 662, 99 *S.Ct.* 3035, 61 *L.Ed.*2d 797 (1979); *Planned Parenthood of Missouri v. Danforth, supra.* The Supreme Court of Washington correctly observed that

> unlike the situation of a normal and necessary medical procedure, in the question of sterilization the interests of the parents of a retarded person cannot be presumed to be identical to those of the child. [*In re Hayes, supra*, 608 *P.*2d at 640]

For this reason, the court must be satisfied that sterilization is in the best interests of the incompetent person.

■ Second, we fully endorse the procedural safeguards employed by the trial court. In every case where application is made for authorization to sterilize an allegedly incompetent person, the court should appoint an independent guardian *ad litem* as soon as possible. The guardian must have full opportunity to meet with the incompetent person, to present proofs and cross-examine witnesses at the hearing, and to represent zealously the interests of his ward in other appropriate ways.

■ In addition, the court should receive independent medical and psychological evaluations by qualified professionals. *In re Hayes, supra*, 93 *Wash.*2d 228, 608 *P.*2d at 641. The trial court in its discretion may appoint its own experts to assist in its evaluation of the incompetent's best interests by examining the individual or testifying at the hearing. *Cf. Township of Wayne v. Kosoff*, 73 *N.J.* 8 (1977) (appointment of independent expert in land condemnation proceedings); *Handleman v. Marwen Stores Corp.*, 53 *N.J.* 404 (1969) (workers' compensation proceedings). *See generally Wigmore on Evidence* § 2484 (3d ed. 1940).

■ The incompetent person need not be present at the proceedings if the court determines that his presence would not be useful in protecting his rights. Nevertheless, the trial judge should personally meet with the individual to obtain his own impressions of competency. This meeting need not be conducted formally and can occur in any convenient and appropriate place, such as chambers, counsel's office, an institution or the incompetent person's home. The incompetent person should be given every opportunity to express his own views about the judicial proceedings and the prospect of sterilization. *In re Hayes, supra*, 93 *Wash.*2d 228, 608 *P.*2d at 641.

■ Third, the trial judge must find that the individual lacks capacity to make a decision about sterilization and that the incapacity is not likely to change in the foreseeable future. *In re Hayes, supra*, 93 *Wash.*2d 228, 608 *P.*2d at 641. Many mentally impaired persons and others with legal disabilities are capable of making their own decisions regarding procreation and sterilization. Neuwirth, Heisler & Goldrich, *Capacity, Competence, Consent: Voluntary Sterilization of the Mentally Retarded*, 6 *Colum.Hum.Rights L.Rev.* 447, 449–53 (1974–1975). We emphasize that there are widely different degrees of mental retardation. The fact that a person is legally incompetent for some purposes, *cf. R.* 4:83 (action for guardianship of incompetent), does not mean that he lacks the capacity to make a decision about sterilization. *See* 6 *Colum.Hum.Rights L.Rev.* at 448. The trial court should be reluctant to substitute its consent for any person who may be capable of making a decision for himself. Therefore, the proponent of sterilization should have the burden of proving by *clear and convincing evidence* that the person to be sterilized lacks the capacity to consent or withhold consent. *In re Hayes, supra*, 93 *Wash.*2d 228, 608 *P.*2d at 640; *In re Penny N.*, *N.H.*, 414 *A.*2d 541, 543 (1980); *cf. Addington v. Texas*, 441 *U.S.* 418, 99 *S.Ct.* 1804, 60 *L.Ed.*2d 323 (1979) (clear and convincing standard of proof for institutional commitments).

Fourth, the trial court must be persuaded by *clear and convincing* proof that sterilization is in the incompetent person's best interests. To determine those interests, the court should consider at least the following factors:

(1) The possibility that the incompetent person can become pregnant. There need be no showing that pregnancy is likely. The court can presume fertility if the medical evidence indicates normal development of sexual organs and the evidence does not otherwise raise doubts about fertility.

(2) The possibility that the incompetent person will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation.

(3) The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her.

(4) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.

(5) The feasibility and medical advisability of less drastic means of contraception, both at the present time and under foreseeable future circumstances.

(6) The advisability of sterilization at the time of the application rather than in the future. While sterilization should not be postponed until unwanted pregnancy occurs, the court should be cautious not to authorize sterilization before it clearly has become an advisable procedure.

(7) The ability of the incompetent person to care for a child, or the possibility that the incompetent may at some future date be able to marry and, with a spouse, care for a child.

(8) Evidence that scientific or medical advances may occur within the foreseeable future which will make possible either improvement of the individual's condition or alternative and less drastic sterilization procedures.

(9) A demonstration that the proponents of sterilization are seeking it in good faith and that their primary concern is for the best interests of the incompetent person rather than their own or the public's convenience.[10]

These factors should each be given appropriate weight as the particular circumstances dictate. The list is not meant to be exclusive. The ultimate criterion is the best interests of the incompetent person.

## VIII

### The Necessity for a Remand

Having established the appropriate standards, we must finally consider whether further proceedings are required to insure that these criteria have been met in the present case.

The proceedings before the trial court complied with the necessary procedural safeguards. The court appointed an independent guardian *ad litem* who had full opportunity to represent zealously Lee Ann's interests in these proceedings. The court examined medical and psychological evidence of Lee Ann's condition. That evidence included both the history and present state of Lee Ann's mental and emotional development. There were also medical evaluations of her physical development and sexual maturation. Finally, the trial judge met briefly with Lee Ann in counsel's office to obtain a personal impression of her condition. These procedures are adequate to protect Lee Ann's rights.

We also have no difficulty in finding that Lee Ann does not have the capacity to decide for herself whether or not to be

---

[10]A similar analysis should be made where sterilization is requested for a male, although we recognize that some of the above factors do not apply. It may be much more difficult to meet the best interests standard in sterilization for males. But we see no justification for applying a different standard. We treat males and females equally when we require that sterilization be authorized only when it is in their best interests.

sterilized. Furthermore, this incapacity is permanent, or at least not likely to change within the foreseeable future. These findings were stipulated by the parties, and clear and convincing evidence in the record supports them. The reports of several doctors, the evidence about Lee Ann's intellectual abilities and the results of Judge Polow's meeting with Lee Ann convince us that he was correct in assessing her present incapacity. The genetic origin of her condition, the evidence about the effects of Down's syndrome, the history of Lee Ann's medical condition, and the opinions of several experts all support the court's conclusion that her incapacity is likely to be permanent.

While the trial court applied the clear and convincing standard of proof to its finding of incapacity, see 170 N.J.Super. at 126 n.20, it apparently did not utilize that standard for its other findings. Our decision today requires that the clear and convincing standard of proof apply as well to the finding that sterilization is in the best interests of the incompetent person. Also, because we have established a stricter standard for determining best interests than that applied by the trial court, we do not know how the court below weighed the factors discussed in this opinion. It is necessary, therefore, to remand to the Chancery Division for application of the new standard to the facts of this case.

We are impressed, however, by the comprehensiveness of the evidence adduced at the hearing and the thoroughness of the record before us. The transcript includes the testimony of Mr. Grady and six expert witnesses called by various parties and the court itself. In addition, the record contains four reports by doctors and a psychologist who examined Lee Ann, a hospital evaluation of her condition at the age of five, four reports by public school personnel dated from 1967 to 1978, a position paper on sterilization by the American Association on Mental Deficiency, and a discussion of Down's syndrome prepared by counsel.

It is extremely important that the public have full knowledge of the facts of this case to avoid any misunderstanding about

the circumstances under which sterilization of an incompetent person may be authorized. Although we have decided to remand for application of the new standard, we believe a review of the evidence may be helpful in future judicial determinations regarding applications for sterilization.

(1) There is evidence in the record to indicate the possibility of pregnancy. Fertility can be presumed because nothing in the record indicates abnormal physical development of sexual organs or otherwise suggests infertility. The evidence indicates that Lee Ann's physiological development is not different from that of other women her age. Her doctors have advised use of birth control measures, suggesting that in their opinion she can become pregnant. Although there is some evidence that in the past Down's syndrome females have not become pregnant as often as other women, there is also evidence that they do in fact become pregnant. While there appears to be a possibility that Lee Ann could become pregnant, the trial court did not make a specific finding about the extent of that possibility or its significance in assessing Lee Ann's best interests.

(2) The testimony of one expert addressed the possibility that pregnancy and childbirth could be traumatic for Lee Ann. While there is empirical evidence that she is not totally cooperative during physical examinations, there is not enough evidence to determine whether pregnancy or childbirth would cause any trauma or psychological damage. It may be that what would be medically required of her during pregnancy and childbirth would cause her pain and anguish which she could not understand. If it could be said that pregnancy and childbirth would yield no benefits to her, it may be in her interest to avoid that pain and anguish. But this is presently speculation.[11]

---

[11]The court below might consider case studies of other Down's syndrome women who have given birth. Two such case studies and other statistical data appear in Scharrer, *et al., Reproduction in a Female Patient with Down's Syndrome*, 26 *Humangenetik* 207–14 (1975); Johnston & Jaslow, *Children of*

(3) The trial court heard conflicting testimony about the likelihood that Lee Ann may be sexually active in the future. At the present time she has indicated no such interest to her parents or doctors. However, her type of mental impairment does not necessarily negate sexual feelings or desires. *See generally* F. de la Cruz & G. LaVeck, *supra.* At present her activities are closely supervised, and it is unlikely that she could engage in sexual activity without her parents' knowledge. Yet she does spend time away from them and other supervising adults. As she grows older, her parents hope to make her more independent. They wish to find a suitable communal environment for Lee Ann. These commendable aspirations of the parents have been tempered by their understandable fear that she could become pregnant. The focal point for consideration is whether it is in Lee Ann's best interests to be relegated to a continuously guarded existence because of her fertility.

(4) Lee Ann has demonstrated some limited knowledge that women become pregnant and have children. Other evidence in the record indicates, however, that she does not understand the process of reproduction or the purposes of contraception. Although presently she takes birth control pills, she does so only under her mother's supervision. It is also necessary to determine whether Lee Ann could ever develop sufficient understanding and judgment to take care of her own needs or make her own decisions about contraception. The mentally impaired can benefit from sex education, F. de la Cruz & G. LaVeck, *supra,* at 57–75; here Lee Ann's intellectual disabilities may cause her lack of understanding to be permanent.

(5) Much of the expert testimony at trial addressed the issue of available means of contraception. The health risks and effectiveness of each method were discussed. This testimony

*Mothers with Down's Syndrome,* 269 *New England Journal of Medicine* 439–43 (1963).

considered the advantages and disadvantages of each method over the period of a woman's child-bearing age. Each method was also evaluated in terms of the ability of a severely impaired person to utilize it successfully. At least one expert testified that sterilization through a procedure known as a laparoscopy is the safest and most effective method of contraception for a woman who plans never to have a baby. The trial court is in the best position to make findings of whether less drastic means of contraception would not be in Lee Ann's best interests.

(6) Perhaps the most troubling factor to be considered is whether sterilization is advisable now rather than at some time in the future. Although Lee Ann was only 18 years old at the time of these hearings, her parents were preparing for her eventual transition into a more independent life. Part of their planning required assurance of her contraceptive protection. Within two years, Lee Ann would no longer be attending public school. The parents needed sufficient time to locate and apply for admission to a work group or home. The fact that her doctors had already advised contraceptive protection for Lee Ann is an indication of their views. We do not think that parents or doctors must wait until sexual activity begins before taking precautions. Nevertheless, without a reasonable likelihood of sexual activity in the near future, an application would be premature. Thus, the trial court should consider the imminence of the parents' plans to place Lee Ann in a communal environment.

(7) The trial court must determine whether at some future date Lee Ann might be able to marry and, with a spouse, care for a child. While her mental impairment and the absence of prospects for improvement make this unlikely, the record is presently silent on the point.

(8) Although one of the experts held a generally optimistic outlook that someday science would find ways to treat Down's

syndrome, he agreed with the other experts that such an advance was not within the near future. The trial court must consider therefore whether foreseeable scientific or medical advances offer any significant hope for cure or treatment of Down's syndrome or for less drastic sterilization procedures.

(9) Finally, we agree with the trial court that the proponents of Lee Ann's sterilization—her parents and the guardian *ad litem*—have sought it in good faith with primary concern for her best interests. Here the record is at its clearest and most convincing.

Having considered all these factors as an appellate court, we are unable to conclude on the basis of clear and convincing evidence that sterilization would be in Lee Ann's best interests. We must therefore remand the parents' application to the trial court for a determination in accord with the standards we have outlined. On many of the issues it may not be necessary for the trial court, in its reconsideration of the case, to receive additional evidence in order to protect Lee Ann's best interests. It is imperative, however, that the evidence be evaluated by the trial court under the stricter standard. We add finally that not every factor we have noted need be shown by clear and convincing evidence to support sterilization. The court should weigh the factors as it deems appropriate, but considered as a whole they must demonstrate by the clear and convincing standard that sterilization at this time is in Lee Ann's best interests.

## Conclusion

The potential for abuse in sterilization of mentally impaired persons allows the exercise of substituted consent only when rigid procedural and substantive criteria are satisfied. By applying the standards we have developed, courts will be able to protect the human rights of people least able to protect themselves.

Lee Ann should have the opportunity to lead a life as rewarding as her condition will permit. Courts should cautiously but resolutely help her achieve the fullness of that opportunity. If she can have a richer and more active life only if the risk of pregnancy is permanently eliminated, then sterilization may be in her best interests. Upon a clear and convincing demonstration, it should not be denied to her.

The judgment of the Superior Court, Chancery Division, is vacated and the matter is remanded for further proceedings in accordance with this opinion.

HANDLER, J., concurring.

I agree with much of the majority opinion, most specifically with the standards established to guide trial courts in these cases. In certain important respects, however, I fear that the articulation of these standards is somewhat misdirected and potentially misleading. I therefore feel constrained to write separately.

It is my view that the standards enumerated in the majority opinion establish and include the requirement that necessity be shown before any sterilization of an incompetent person can be judicially authorized. The majority's under statement of this reality is both perplexing and unfortunate. *Ante* at 262. It is true that the factors set down by the Court are more expansive and detailed than those emphasized by the Public Advocate and the Attorney General, *ante* at 262, 265–266. Both have urged that necessity for sterilization surgery must be demonstrated and have focused upon the need to show a likelihood of sexual activity and pregnancy, as well as an absence of other feasible, less drastic alternative means for avoiding pregnancy. Nevertheless, the thrust of the position of these two government public representatives has not been totally repudiated by the Court simply because the test today adopted is multifaceted. We now hold that included within the broad standard that must

be met in determining the best interests of the incompetent are the important elements of (1) likelihood of sexual activity and (2) the feasibility and medical advisability of less drastic means of contraception. *Ante* at 265–266. Hence, these criteria of necessity have been incorporated in this Court's standard as an integral, albeit nonexclusive, part of the calculus of concerns relevant to the awesome determination made in cases of this sort.

The factors that have been added to those espoused by the Public Advocate and Attorney General have not been promulgated to dilute or weaken the requirements for judicially authorized sterilization. On the contrary, they serve to stiffen judicial responsibility by mandating a thorough, far-reaching and conscientious consideration of all elements that are relevant in the consideration of an incompetent's best interests.

I am not sure why the majority has shied from the terminology of necessity. Perhaps, at least in the special context of this case, it reflects an understandable, but exaggerated, emphasis upon privacy rights. What is really involved in this case, however, is not so much the incompetent's right of personal choice—nature has already deprived her of that—but rather what is in her best interests. I do not believe therefore that we are called upon to act as Lee Ann Grady's surrogate in exercising her rights of personal choice. *Cf. In re Quinlan*, 70 *N.J.* 10, *cert.* den. 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.2d* 289 (1976). Rather, we are confronted with a different task—to identify, define and preserve her best interests in order to enhance her opportunities for lifetime happiness. *N.J.Const.* (1947), Art. I, par. 1 (individual has natural and inalienable right to pursue and obtain happiness). Necessity, as a legal condition to the exercise of privacy rights, may indeed be an intolerable obstacle with respect to persons entitled to individual autonomy and fully capable of personal choice. However, with respect to one incapable of choice, necessity must remain an extremely important, if not an indispensable predicate, for the judicial determination of

best interests and the interposition of irreversible judicial choice in such a profoundly personal area as sterilization.

As I have mentioned, I do not believe that the majority has eliminated the doctrine of necessity since its elements are included in its overall standard. Hence, its lack of prominence should not be deemed significant. Trial courts should be aware that the Court's standards are stringent, the lack of a necessity label notwithstanding.

Additionally, I deem it prudent to emphasize the important principles embraced in the Developmentally Disabled Rights Act, *N.J.S.A.* 30:6D–1 *et seq.*, and the act commonly known as the "Bill of Rights for the Mentally Retarded," *N.J.S.A.* 30:4–23 *et seq.* I agree with the majority that these acts do not directly govern the rights of the noninstitutionalized incompetent person in this case. But surely the broad objectives of this signal legislation must be shared by this Court.

Fittingly, the judicial determination reached in this case is in tandem with current legislative efforts on behalf of the handicapped and is consonant with the legitimate concern expressed by the Legislature in these areas. The confluence of judicial and legislative thinking flows from a common headwater, namely, the Constitution, *N.J.Const.* (1947), Art. I, par. 1. These enactments are a positive affirmation of a deep governmental and public solicitude for the well-being of handicapped persons. See *Levine v. Dept. of Inst. & Agencies*, 84 *N.J.* 234, 249 (1980). They evince a strong public policy that is assiduous in the protection of the rights of the mentally handicapped—a philosophy which imbues the Court's opinion. I believe this symmetry between branches of government in so sensitive a matter as the individual well-being of helpless persons in a high desideratum. This Court would be remiss in failing to be responsive to the legislative view in these matters for "legislative policy . . . is itself a source of law, a new generative impulse transmitted to the legal system." *Van Beeck v. Sabine Towing Co.*, 300 *U.S.* 342, 351, 57 *S.Ct.* 452, 456, 81 *L.Ed.* 685, 690 (1937) (Cardozo, J.).

It is therefore of some significance that both of these statutes explicitly establish a necessity standard in sterilization cases. *N.J.S.A.* 30:6D–5(a)(4); *N.J.S.A.* 30:4–24.2(d)(2). This further indicates that a necessity requirement is implicit in the Court's holding.

Finally, I note that although the Court has concluded that the evidence must meet a clear and convincing standard *in the aggregate* before an order of sterilization may be justified, I envision that the failure to marshall evidence as to some of the elements of the Court's test could conceivably result in a denial of an application for sterilization, regardless of the overwhelming weight of evidence available to satisfy other components of the test.[1] The Court has recognized that the judicial discovery of the best interests of an incompetent in terms of whether his or her sterilization should be authorized is complex and manifold. Clearly it requires substantial proofs with respect to all facets of the applicable standard.

With these clarifications and observations, I concur in the result and the essentials of the majority opinion.

*For vacation and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.

---

[1]Thus, for example, the inquiry into the best interests of an incompetent must explore the extent to which the surgery, hospitalization and recuperation entailed in a sterilization operation would be traumatic and detrimental to the incompetent or carry the risk of mortality. This factor is not emphasized by the majority and the record is sparse in this regard. Yet, I believe it is an important element in any best interests inquiry and a failure to deal with it could strongly militate against the soundness of an ultimate conclusion that sterilization would be in the best interests of the individual, other evidence notwithstanding.