263 N.J. Super. 632 (1993)
623 A.2d 806
SOPHIE (GEORGIA) KRONBERG, PLAINTIFF,
v.
LOUIS KRONBERG, DEFENDANT.
Superior Court of New Jersey, Chancery Division Essex County, Family Part.
Decided January 13, 1993.
*633 Francis W. Donahue for plaintiff (Skoloff & Wolfe attorneys) Phyllis S. Klein, on the briefs.
Morton S. Bunis for defendant (Sills Cummis Zuckerman Radin Tischman Epstein & Gross, attorneys) Robert M. Axelrod and Debra DuBritz O'Gorman, on the briefs.
H.S. GLICKMAN, J.S.C.
This case raises, for only the second time in New Jersey, the issue of whether a guardian has the power to maintain an action for divorce on behalf of an incompetent. The prior case, In re Jennings, 187 N.J. Super. 55, 453 A.2d 572 (Ch.Div. 1981), held that the mother of an incompetent was not entitled to be appointed as guardian for her son for the purpose of filing a suit for divorce against her daughter-in-law based upon allegations of adultery. This court has determined that Jennings may be factually distinguished from the case sub judice and holds that a guardian can maintain a suit for divorce on the no-fault ground of separation. The issue presented in this case has never been decided by a New Jersey appellate court.

FACTUAL BACKGROUND
The factual background upon which this decision is predicated is largely undisputed. Sophie and Louis Kronberg were married on October 25, 1931. They have three emancipated children: Martin, Diane and Barbara.
In April 1991, a complaint was filed in the Chancery Division, Essex County, seeking to declare Sophie, "to be mentally incompetent as a result of Parkinson's Disease", and to have the *634 plaintiffs in that action, her three children, appointed as guardians of her person and property.
The complaint for the appointment of the guardians was supported by an affidavit from two medical doctors. In an affidavit dated April 3, 1991, one of the doctors stated:
Mrs. Kronberg requires total care for all activities of daily living  even someone to feed her. She is very pleasant and tries to cooperate. She speaks only yes or no, but is only oriented toward her name. She is not aware of time or place. She is very confused, disoriented and with almost no short-term memory.
Judge Kimmelman signed an order on April 18, 1991 fixing the date for the hearing. In that order, he appointed Gary N. Skoloff as counsel for the alleged mental incompetent.
According to the transcript of the proceedings, which took place before Judge Kimmelman on June 7, 1991, Robert Penza appeared for the plaintiffs (Mr. Penza had filed the complaint), George Bloom appeared on behalf of Barbara, Mr. Skoloff appeared for Sophie, and Harold Krieger appeared for Louis.
As of June 7, 1991, Sophie required, and was being provided with, 24-hour nursing care in her apartment in Clairidge House I in Verona. Sophie was unable to feed, clothe or take care of herself in any way. She had been receiving full-time care for approximately two years prior to June of 1991.
Diane testified before Judge Kimmelman that her father wanted her and her siblings to be appointed the legal guardians for Sophie and Louis signed a "Renunciation" in favor of his children on March 22, 1991.
It is clear from the transcript that the main reason for instituting the incompetency proceedings was so that Louis could file a complaint for divorce against his wife of 61 years, and so that the papers could be served upon her guardians. Louis contends that his children were not appointed guardians of his wife so that he could proceed with the filing of a divorce action, but a fair reading of the transcript does not reveal any other reason for the institution of the incompetency proceedings.
*635 It has been alleged in the proceedings before me that Louis, through his attorney, requested Judge Kimmelman to finalize the divorce on June 7, 1991 or shortly thereafter, but Judge Kimmelman was unwilling to do so because a divorce complaint had not yet been filed. There is nothing in the transcript and there is nothing in the record before me that would support that allegation of the plaintiff.
Judge Kimmelman signed the "Judgment for Appointment of Guardian" on July 1, 1991. That judgment appointed Martin, Diane and Barbara as guardians of the person and property of their mother. For reasons that are not clear, Louis did not file a divorce complaint. However, his attorney, Harold Krieger, prepared a draft of a complaint in November of 1991 and he sent the draft to Mr. Skoloff. The complaint alleged a separation of more than 18 months, commencing in or about October of 1987. Prayer (b) of the draft complaint sought an order "approving the terms and conditions set forth in the attached Settlement Agreement". There was no agreement attached to the complaint, and it has been represented to this court that although discussions took place and draft documents were prepared, no agreement was ever executed by Louis.
Louis submitted a certification in opposition to Mr. Skoloff's application for fees in the guardianship proceeding, in which he stated in paragraph 6:
It was my intention to go forward with a divorce proceeding. However, I decided not to do so when all sorts of demands were being made upon me as a condition of my obtaining a divorce. The form of divorce complaint which is attached to Mr. Skoloff's certification was prepared by my attorney and sent to Mr. Skoloff as a matter of courtesy to see if there would be any objection to same. At no time was the divorce action filed or pursued.
There were no further court proceedings until Martin, Barbara and Diane filed a complaint against their father and six other defendants on July 13, 1992. Although the complaint has a law division docket number, the case is presently pending in the chancery division. The complaint asserts six separate causes of action against various defendants, including a cause of action against their father for an alleged breach of contract. *636 Louis filed an answer and counterclaim against his three children, as well as a third party complaint against two of his grandchildren. The guardians filed their complaint for divorce on behalf of their mother, against their father, on July 30, 1992. An order to show cause with restraints was signed on that date. Those restraints were continued by an order dated August 7, 1992.
In response to the order to show cause, Louis filed a motion seeking to dissolve all restraints and to dismiss the complaint, "as improperly brought by a guardian of a party". That motion was originally returnable August 21, 1992. Sophie, by her attorneys, filed a motion originally returnable October 9, 1992, seeking to bifurcate the issues and to allow an immediate hearing on the cause of action for divorce. The bifurcation application was initially made to the Assignment Judge who referred it back to this court.
Sophie and Louis have been separated at least since October of 1987. Since that time, and for an unspecified period prior thereto, Louis has lived with Nina Paris in New York City and elsewhere. Louis contends that he has lived with Ms. Paris during most of the past ten years. As previously indicated, Sophie has required round-the-clock care since at least the middle of 1989, and perhaps prior thereto. It has not been established whether Sophie knew, before she became incompetent, that her husband had been living with another woman and that he had, as admitted by Louis, contributed to the household expenses of Ms. Paris and that he made substantial gifts of expensive jewelry and valuable works of art to her. Ms. Paris was traveling with Louis in Italy in September of 1988 when he suffered a stroke. He has recovered, except for a slight speech difficulty and a paralysis of three fingers on his right hand.
According to Louis, he has not had a marital relationship with Sophie for at least 20 years and he claims that they saw each other only infrequently over the past ten years. Louis contends that for many years Sophie and the children were aware *637 of his separate life, but that allegation is disputed by his children who have alleged that until his stroke, their father "took extraordinary measures to protect his family and his wife from learning about Ms. Paris".
Prior to the time when Sophie became incapacitated and for a significant period of time thereafter, Louis had executed a will and had created an estate plan which left all or most of his estate to his wife and other family members. Four days after the three children filed their complaint against their father and six other defendants in July of 1992, Louis, on July 17, 1992, executed a new will in which the children were disinherited.
It has been stipulated that the marital estate of Louis and Sophie has a value in excess of $10,000,000. There have been references to a marital estate with a value in excess of $30,000,000. Most of the estate is in Louis' name or under his control. The major asset consists of the sole ownership by Louis of Crown Travel Agency. During the years of 1989 and 1990, Louis received total compensation by way of salary and bonus of $3,530,000 and $3,556,250, respectively. He received approximately the same amount in 1991. During those years, Barbara, who worked in the business full-time with her father, received total compensation of $760,500, $499,000 and $320,000, respectively. Martin and Diane worked part-time during those years, but they also received substantial salaries and bonuses. I refer to the income generated by the business only to demonstrate that it has a substantial value for purposes of equitable distribution in the event of a divorce between Sophie and Louis. Martin, Barbara and Diane were terminated from their employment with Crown Travel by their father in December 1991. The reasons for the terminations are not relevant to the issues being decided in this opinion.
It is clear that one of the motivating factors behind the filing of the divorce complaint by Sophie's three children against their father is their desire to share in the family estate. They have been disinherited by their father. Sophie has a nominal estate *638 and, apparently, has no will. Therefore, Martin, Barbara and Diane, if they share to any extent in the family estate, will receive an insignificant share of that estate based upon what they will receive from their mother under the laws of intestacy, N.J.S.A. 3B:5-2, unless their parents are divorced and there is an award of equitable distribution to Sophie.
If the divorce complaint is allowed to proceed, and if Louis should die prior to the dissolution of the marriage, Sophie would not qualify for the elective share of one-third of Louis' estate pursuant to N.J.S.A. 3B:8-1, even if she were competent to make the election. She would not qualify because it is undisputed that she and Louis have lived separate for many years. The election is only available if "the surviving spouse had not been living separate and apart in different habitations or had not ceased to cohabit as man and wife." N.J.S.A. 3B:8-1.
If the divorce action is allowed to proceed, the guardians seek to bifurcate the issue of divorce from the other issues in order to avoid the problem discussed in Carr v. Carr, 120 N.J. 336, 576 A.2d 872 (1990). As that case illustrates, except for the equitable remedy of constructive trust, there can be no distribution of marital assets unless the parties are divorced or unless the wife can receive an elective share under N.J.S.A. 3B:8-1.

STATUTORY AUTHORITY
The thrust of the defendant's argument to dismiss this action is that a decision to obtain a divorce is a personal one which cannot be made by the guardian of an incompetent person in the absence of statutory authorization. He relies upon Jennings, supra, and cases from other jurisdictions. His argument that the guardians have no volitional basis to maintain this action because Sophie cannot communicate her desire to obtain a divorce will be addressed later in this opinion.
There are several relevant statutes which define the powers of a guardian. "It is a cardinal principle of statutory *639 construction that statutes relating to the same or similar subject matter  statutes in pari materia  are to be construed together." Palmer v. Kingsley, 27 N.J. 425, 429, 142 A.2d 833 (1958). The statutes which define the authority of a guardian, when considered in pari materia, empower a guardian to institute a suit for divorce on behalf of an incompetent.
N.J.S.A. 3B:12-49 defines the court's power over the estate of a minor or incompetent. That statute provides in part:
The court has, for the benefit of the ward, his dependents and members of his household, all the powers over his estate and affairs which he could exercise, if present and not under a disability, except the power to make a will, and may confer those powers upon a guardian of his estate.
The statute then provides that "These powers include, but are not limited to ..." specific powers enumerated thereafter. As the court in Matter of Guardianship of A.D.L., 208 N.J. Super. 618, 506 A.2d 792 (App.Div. 1986) noted:
The quoted provision gives the court, and permits it to confer on the guardian, all of the powers which a minor could exercise over the estate if not under the disability of minority, except the power to make a will.
(208 N.J. Super. at 624, 506 A.2d 792).
It is significant that while the Legislature conferred a broad, nonexclusive list of powers on a guardian, the only power that was withheld was the power to make a will. That single exception has been maintained by the Legislature since it initially defined the powers of a guardian over the estate of a minor or mentally incompetent. See N.J.S.A. 3A:6-16.19 (repealed); L. 1979 c. 482, § 14.
It is clear that the legislative intent was to confer upon the guardian of an incompetent the same powers and responsibilities that were given to the guardian of a minor. N.J.S.A. 3B:12-56.
For more than 77 years, the Legislature has authorized a parent or guardian to prosecute or defend "any suit respecting the marriage status or relation of such infant or infants." L. 1915, c. 299, p. 540. The statute in its present form, N.J.S.A. 2A:34-14, provides:

*640 A parent or guardian shall not be precluded by the provisions of this chapter from prosecuting or defending any action respecting the marriage status or relation of his minor child or ward.
That statute, when construed with N.J.S.A. 3B:12-49, which confers broad powers upon a guardian, with the only exception being the power to make a will, creates the authority for a guardian to file a divorce action on behalf of an incompetent.

PARENS PATRIAE JURISDICTION
The court in Jennings, supra, 187 N.J. Super. at 55, 453 A.2d 572, having found no statutory authority for a guardian to seek a divorce on behalf of an incompetent, declined to exercise its equitable jurisdiction on the ground that "a decision to seek a divorce is so intensely personal that it cannot be made for someone else." (187 N.J. Super. at 59, 453 A.2d 572). See Niland v. Niland, 96 N.J. Eq. 438, 126 A. 530 (Ch. 1924). This court disagrees and holds that it has inherent parens patriae jurisdiction to authorize a guardian to obtain a divorce on behalf of someone who lacks the capacity to make that decision. Cf. In re Grady, 85 N.J. 235, 261, 426 A.2d 467 (1981).
An incompetent, like a minor child, is a ward of the state, and the state's parens patriae power supports the authority of its courts to allow decisions to be made for an incompetent that serve the incompetent's best interests, even if the person's wishes cannot be clearly established.
(Matter of Conroy, 98 N.J. 321, 364, 486 A.2d 1209 [1985]).
Everyone agrees that a decision to obtain a divorce is a personal one, but the Supreme Court has authorized guardians to make decisions that are even more personal in nature. In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); In re Grady, supra, 85 N.J. 235, 426 A.2d 467; Matter of Conroy, supra, 98 N.J. 321, 486 A.2d 1209; and Matter of Jobes, 108 N.J. 394, 529 A.2d 434 (1987). Quinlan, Conroy and Jobes, involved life and death decisions, i.e. whether life support systems should be removed from the incompetent. In Grady, supra, the Court remanded the issue of sterilization for a determination by clear and convincing proof that sterilization was in the best interests *641 of the incompetent. The Supreme Court in those cases authorized the guardians to make personal decisions on behalf of their wards who were unable to communicate their desires to anyone.
The Supreme Court in Quinlan, supra, quoted with approval from the opinion of the trial court:
As part of the inherent power of equity, a Court of Equity has full and complete jurisdiction over the persons of those who labor under any legal disability.... The Court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the Court may pass upon purely personal rights. (70 N.J. at 44, 355 A.2d 647).
Prior to making the determination that the guardians would be permitted to maintain this action on behalf of their mother, I had to decide that Sophie, if she were competent, would have filed suit for divorce against her husband. Because of her incompetency, I also had to decide whether it was in her best interests to permit the guardians to obtain a divorce on her behalf. The undisputed facts, previously recited, convinced me to decide those questions affirmatively.
If Louis were to predecease Sophie, she could not receive an elective share of his estate pursuant to N.J.S.A. 3B:8-1, if she were otherwise competent to make the election, because she and Louis have been living separate and apart for many years. That same disability would preclude a guardian from making the election for the support of the surviving spouse under N.J.S.A. 3B:8-11. If Sophie were competent but otherwise seriously disabled, there would be no way for her to provide for her future security except to file for divorce and to seek support and equitable distribution from her estranged husband. If she were competent, she could have filed a suit for separate maintenance under N.J.S.A. 2A:34-24 but, in the absence of a divorce, there could be no award of equitable distribution of the substantial marital estate. Carr, supra, 120 N.J. at 342, 576 A.2d 872. Although Louis has paid for round-the-clock care for Sophie for several years, and he has offered to establish a trust in order to continue that care, the fact remains that no trust *642 had ever been created and properly funded prior to the determination of incompetency in June 1991 or subsequent thereto.
Defendant argues that there will be no benefit to Sophie if there is a divorce and an award of equitable distribution, because she would be unable to understand or appreciate the fact that she received her share of the marital estate. In a different context, the Supreme Court in Matter of Conroy, supra, answered a similar argument: "The right of an adult who, like Claire Conroy, was once competent, to determine the course of her medical treatment remains intact even when she is no longer able to assert that right or to appreciate its effectuation." (98 N.J. at 359, 486 A.2d 1209). The Court then quoted with approval from a law review article.
Even if the patient becomes too insensate to appreciate the honoring of his or her choice, self-determination is important. After all, law respects testamentary dispositions even if the testator never views his gift being bestowed.
* * * * * * * *
Any other view would permit obliterations of an incompetent's panoply of rights merely because the patient could no longer sense the violation of those rights.
(98 N.J. at 360, 486 A.2d 1209).
The fact that Sophie will not be able to understand or appreciate that she has received her share of the marital estate and that her share will pass to her heirs, N.J.S.A. 3B:5-2, including her children who have been disinherited by her husband, will not prevent this court from allowing the guardians to do on her behalf what, it is presumed, she would have done for herself if she were competent. When reaching that result, I considered it to be relevant that before Sophie became incompetent, the estate plan that was in effect would have distributed most or all of the marital assets to her and her children.
A determination of what Sophie's fair share of the marital estate will be will await the completion of normal discovery, to be followed by a plenary hearing. The award of equitable distribution will be established according to the factors listed in N.J.S.A. 2A:34-23.1.

*643 JENNINGS DISTINGUISHED
In Jennings, supra, 187 N.J. Super. 55, 453 A.2d 572, the parties were married for less than two years and were living together when Mr. Jennings suffered irreversible brain damage during surgery. Mr. and Mrs. Jennings had no children. Mr. Jennings' mother sought to be appointed as his guardian for the purpose of filing a divorce action against her daughter-in-law on the grounds of adultery. The adultery is alleged to have occurred after Mr. Jennings became incompetent. The marriage was apparently intact prior to the surgery.
In the present case, the marriage of 61 years has been dead for many years, including a significant period preceding the incompetency of Sophie. There is no dispute that Louis and Sophie have been separated at least since October 1987. The plaintiff in Jennings intended to rely upon the fault-ground of adultery. Louis had alleged, and the guardians have alleged on behalf of Sophie, a no-fault cause of action. Unlike Jennings, where the plaintiff sought to be appointed as guardian for her son, Sophie's children were previously appointed as her guardians at the request of Louis so that he could obtain the divorce.
The court found that Mr. Jennings had nothing to gain as the result of being divorced. As the result of a medical malpractice case brought on behalf of Mr. Jennings, $600,000 was placed in escrow to provide for his care. As has been explained elsewhere in this opinion, Sophie has much to gain as the result of a divorce, including receiving her share of an estate having a value of more than $10,000,000.
The court in Jennings found no statutory authority for Mr. Jennings' mother to seek a divorce on behalf of her son. As noted above, I have found such authority.
There is a common thread in both cases. Mr. Jennings' mother would have received a large financial benefit in the event that her son died without a wife. The guardians before me will benefit if there is a divorce and an award of equitable distribution is made. In both cases, a much larger estate of the *644 incompetent would pass to the guardians/heirs under the laws of intestate succession if the divorce action were allowed to proceed. The financial interest of the guardians in the outcome of this case will not change the conclusion previously reached. However, a guardian ad litem will be appointed by this court to ensure that the financial and property issues will be decided in the best interests of Sophie. R. 4:26-2.
The court in Jennings referred to a hypothetical case in which an imaginary wife hires a killer to murder her husband.
The attempt fails, but it does render the husband permanently incompetent. Counsel asks whether the law could fairly deny the husband, acting through a guardian, the right to seek a divorce. If, as a judge, I ever come across counsel's hypothetical wife, I am sure that I will figure out a way to deal with her. I might well rule in favor of a divorce proceeding in a case such as that, and I would certainly prevent the hypothetical wife from getting her husband's money.
(187 N.J. Super. at 62, 453 A.2d 572).
Thus, that court indicated that there might be a factual setting in which an incompetent, acting through a guardian, could have obtained a divorce. This court, for reasons previously stated, will allow Sophie, acting through her guardians, to terminate her marriage and receive an award of equitable distribution.

BIFURCATION
Having determined that this action may be maintained on behalf of Sophie, this court will address the issue of bifurcation. The guardians seek to bifurcate the cause of action from the other issues "in the interest of justice". Louis opposes the application because he contends that it would defeat the objective of judicial economy and because it would "give the plaintiff/guardians preferential treatment over the hundreds of other litigants in this county who are parties to contested divorce actions and are forced to wait many months for a trial date before they can secure a divorce.... Bluntly put, it would discriminate against other litigants because they are younger." (Defendant's letter memorandum, October 14, 1992, p. 9).
*645 Defendant's arguments in opposition to bifurcation are not persuasive. Having decided that the guardians may prosecute the divorce action on behalf of Sophie, this court will bifurcate the cause of action from the other issues in an effort to avoid the problem of the "black hole" discussed in Carr, supra, 120 N.J. at 344, 576 A.2d 872.
As pointed out in Leventhal v. Leventhal, 239 N.J. Super. 370, 373, 571 A.2d 348 (Ch.Div. 1989), there is no specific authorization for bifurcation in this State, either by statute or court rule. The issue was addressed in the Supreme Court Committee on Matrimonial Litigation, Interim Report (July 20, 1979). The report recommended that bifurcation should be granted "only in unusual and extenuating circumstances...." (Id. at 24).
Leventhal, supra, held that extreme calendar congestion with resultant trial delays which prevented the moving party from remarrying was not a sufficient reason to allow bifurcation. However, bifurcation was permitted in Culp v. Culp, 242 N.J. Super. 567, 577 A.2d 872 (Ch.Div. 1990), because of the defendant's age and health, "to avoid the problems stemming from defendant's untimely death which would deprive the surviving spouse of equitable distribution under N.J.S.A. 2A:34-23 [now N.J.S.A. 2A:34-23.1] while excluding her, because of the moribund marriage, from an elective share under N.J.S.A. 3B:8-1." (242 N.J. Super. at 569, 577 A.2d 872).
Although the court rejected bifurcation in Leventhal, supra, it acknowledged that,
[E]ven without the express authorization of the Legislature, New Jersey courts may decide whether it is in the best interests of the parties to permit a separate trial of ancillary matters after a divorce has been granted.
(239 N.J. Super. at 376, 571 A.2d 348).
The Supreme Court in Carr, supra, held that the equitable remedy of constructive trust, "if warranted by the evidence," should be invoked, together with principles of quasi-contract to avoid the unjust enrichment that would occur if the wife's share *646 of the marital property would otherwise remain a part of the husband's estate. (120 N.J. at 353, 576 A.2d 872).
The necessity of resorting to those equitable remedies will be obviated by granting plaintiff's bifurcation application. The ages of the parties and the frail health of Sophie, when considered in light of the other facts of this case, constitute the "unusual and extenuating circumstances" contemplated by the Supreme Court Committee on Matrimonial Litigation. Plaintiff's application to bifurcate the cause of action from the other issues will be granted.

CONCLUSION
This is a court of equity. I have tried to reach a result that will be fair for both spouses.
If Sophie had controlled a ten million dollar marital estate and had executed a will prior to her incompetency, leaving all of her property to non-family members, Louis would have been able to file a complaint for divorce against his incompetent wife for the purpose of obtaining his share of equitable distribution. Sophie, despite her disability, should have the same opportunity. There is no reason in law or equity why her guardians cannot do so on her behalf.
When the Legislature created the no-fault ground for divorce in 1971, N.J.S.A. 2A:34-2(d), the legislative intent was to establish an additional cause of action in keeping with public policy that "dead marriages should be legally terminated". See Final Report to the Governor and the Legislature of the Divorce Law Study Commission (May 11, 1970) 73. This court has attempted to carry out that public policy by allowing the guardians to maintain this action in an effort to legally terminate a marriage that has been dead for many years.