BECK, Judge.
The issue presented in this case is whether a guardian with authority to consent to a tubal ligation should be appointed for C.W., a 24 year old mute woman with a mental age of 3-5. She suffers from moderately severe retardation, grand mal epilepsy, cerebral palsy and scoliosis. The trial court determined that it was in C.W.’s best interest that her mother be appointed as her guardian, with specific authority to consent to a laparoscopic tubal ligation.
The trial court’s decision reflects an exceedingly careful consideration of the voluminous record and is in accord with the law of this Commonwealth. We affirm.
We have carefully examined the record in this case to determine whether it supports the judge’s findings regarding C.W.’s mental and physical condition. We have also reviewed the expert opinions regarding the available medical and non-medical options, and the governing legal standards. We begin by emphasizing that in this case we are not confronted with a legal tabula rasa. The standards governing a determination of whether sterilization of an incompetent is to be permitted were established in 1982 in In the Matter of Mildred J. Tenvilliger, 304 Pa.Super. 553, 450 A.2d 1376 (1982), and our analysis simply applies the legal principles established in Tenvilliger to the facts of this case.[1]
*428 In Terwilliger, the father of a mentally retarded woman sought to have the court declare his daughter incompetent and to have himself appointed as her guardian for the purpose of consenting to her sterilization by tubal ligation. The trial court granted both requests. On appeal, a panel of this court reversed and remanded for further proceedings. The Terwilliger court first determined that the Orphans’ Court had jurisdiction to grant the requested relief.[2] The court then proceeded to establish clear guidelines for the decision of such cases. The court began with the following cautionary statements:
We caution that because sterilization necessarily results in the permanent termination of the intensely personal right of procreation, the trial judge must take the greatest care to ensure that the incompetent’s rights are jealously guarded.
[I]n making the decision of whether to authorize sterilization, a court should consider only the best interest of the incompetent person, not the interests or convenience of the individual’s parents, the guardian or of society.
Id. at 564, 450 A.2d at 1382 (emphasis supplied).
Thus, the Terwilliger court recognized that a decision that an incompetent should undergo a sterilization procedure impinges on that person’s fundamental right to procreate and involves an invasion of that person’s bodily integrity.
With these principles in mind, the Terwil-liger court made several procedural determinations. First, the court found that given the fundamental right involved in such cases, the party seeking approval of the sterilization procedure had the burden of proof and that the standard of proof required was that of clear and convincing evidence. Id. Even more importantly, the Terwilliger court established that the crucial question to be answered in such cases was whether the sterilization was in the best interest of the incompetent.
The court then required that a guardian ad litem be appointed to represent the interests of the incompetent at the hearing, that comprehensive medical, psychological and social evaluations be made of the incompetent, and that the trial court be permitted to appoint its own experts to assist in the evaluation of the incompetent. Further, the court stated that although the incompetent need not be at the hearing, the trial court should meet with the incompetent to form the court’s own opinion as to competency and elicit any views regarding the sterilization that the incompetent would be able to express.
Having established these procedural ground rules, the Terwilliger court mandated two specific findings by the trial court as necessary prerequisites to authorizing the sterilization. First, the court must find that the individual lacks capacity to make a decision about sterilization and that the incapacity is not likely to change in the foreseeable future. Second, the court must find that the incompetent is capable of reproduction. If the court is able to make these findings, then the court must proceed to its ultimate determination, i.e., is sterilization in the incompetent’s best interest?
Terwilliger viewed the best interest determination as ultimately depending on a finding that:
sterilization is the only practicable means of contraception, i.e., all less drastic contraceptive methods, including supervision, education and training are unworkable and detailed medical testimony must show that the sterilization procedure requested is the least significant intrusion necessary to protect the interests of the individual.
Id. at 566, 450 A.2d at 1383.
The Terwilliger court provided the following non-exclusive list of “guidelines”, adopted *429 from the decision of the Supreme Court of New Jersey in In re Grady, 85 N.J. 235, 426 A.2d 467 (1981), to assist the trial court in making this decision:
(2) The possibility that the incompetent person will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation.
(3) The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her.
(4) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.
(7) The ability of the incompetent person to care for a child, or the possibility that the incompetent may at some future date be able to marry and, with a spouse, care for a child.
(8) Evidence that scientific or medical advances may occur within the foreseeable future which will make possible either improvement of the individual’s condition or alternative and less drastic sterilization procedures.
(9) A demonstration that the proponents of sterilization are seeking it in good faith and that their primary concern is for the best interests of the incompetent person rather than their own or the public’s convenience.
Id., 304 Pa.Super. at 567, 450 A.2d at 1383-84 (quoting In re Grady, supra).
Despite the apparent specificity of these guidelines, the Terwilliger court wisely allowed the trial court latitude in making the ultimate determination of the best interests of the incompetent. Thus, the court expressly stated that the list was not exhaustive, and that the weight to be accorded to each factor would appropriately vary in each case.
It is against this clear legal standard that we must judge whether it is in the best interests of C.W. that a guardian, with authorization to consent to a tubal ligation of C.W., be appointed.[3]
As to the appellate court’s standard of review, the Terwilliger court instructed:
Additionally, because of the sensitive and irrevocable nature of a sterilization operation, we wish to make it clear that appellate review of the instant type of case will be of the broadest scope, and this court will not be bound by the inferences or deductions of the lower court.
Id. at 568, 450 A.2d at 1384.
We begin with a brief statement of the procedural history of this matter, followed by a general description of C.W.’s physical and mental disabilities, her personality and emotional nature, and her living arrangements and activities. We then proceed to a thoroughgoing review of the expert opinion testimony received by the trial court insofar as it is pertinent to each of the findings and guidelines identified in Terwilliger. Finally, we analyze all of this information in light of the dictates of Terwilliger.

PROCEDURAL HISTORY

This action was initiated in the Orphans’ Court Division of the Court of Common Pleas for Philadelphia County through the filing of a petition by C.W.’s mother (sometimes hereinafter referred to as “petitioner”). Petitioner sought appointment as C.W.’s guardian, with specific authority to consent to the performance of a tubal ligation on C.W. As required by Terwilliger, the trial court appointed a guardian ad litem to represent the interests of C.W. Both the petitioner and the guardian ad litem engaged numerous ex *430 perts to examine C.W., to opine on her mental and physical condition and, more specifically, to address the subject of her best interests in regard to contraception and sterilization. Very early in the proceedings, the guardian ad litem took the position that performance of a tubal ligation was not in C.W.’s best interests.
Hearings were held on March 22, April 14, April 15, May 12 and June 6,1988. At these hearings, extensive testimony from witnesses called by both parties was taken. The trial judge determined that it was not fruitful for C.W. to be present, in that she clearly could not participate and did not understand the proceedings. The trial judge did personally interview C.W. in chambers. After the completion of the initial hearings, the trial judge determined that she needed additional expert testimony, and engaged the services of Dr. Bolognese, Chairman of the Department of Gynecology and Obstetrics at Pennsylvania Hospital. Further hearings were conducted on August 17, 1989, at which Dr. Bolognese testified. At the request of petitioner, additional testimony from certain witnesses who had previously testified and from certain new witnesses was taken at a final hearing on October 4, 1989.
On February 28, 1990, the trial court entered an order granting the petition and authorizing the petitioner to consent to the performance of a laparoscopic tubal ligation on C.W. The trial court accompanied its order by a 53 page opinion in which it reviewed the extensive testimonial and documentary evidence and analyzed it under the Terwilliger standard. Exceptions filed by the guardian ad litem were denied by an en banc panel of the Orphans’ Court and the trial court’s order was made final by decree entered August 1, 1991. This timely appeal ensued.[4]

GENERAL BACKGROUND

C.W. is a 24 year old woman who has suffered since infancy from scoliosis, cerebral palsy, grand mal epilepsy and moderately severe retardation. Although the precise cause of her condition is not clear, it is agreed that her mental and physical disabilities are irreversible. Her seizure disorder is extremely severe. In some years of her life, C.W. has experienced over 50 seizures, some of which are severe and can last for over an hour. Every day she is administered three drugs, Phenobarbital, Dilantin and Tegritol, some in toxic doses, to control her epilepsy. Even this treatment is not fully effective. Any virus, infection or fluctuation in her temperature may affect her medications and cause her to have a seizure. Without medication, she could experience status epilepti-cus where she would seize repeatedly. Such attacks are known to be fatal.
The record reveals at least one specific example of the severity and instability of C.W.’s epileptic status. At one point in 1989, C.W.’s behavior became more aggressive and self-abusive. It was thought that her Dilan-tin level was too high and was possibly contributing to her behavior problem. Although her neurologist was reluctant to do so, the Dilantin dosage was reduced. C.W. then experienced a severe seizure and her medication level had to be increased to a toxic level to stabilize her. Even at this level, C.W. seized again. C.W.’s primary physician identified this episode as a reminder of how difficult it is to control C.W.’s epilepsy.
C.W. suffers from organic brain damage and is mute. She communicates in a very limited fashion through minimal signing and making certain noises that those around her have learned to interpret. Experts who have evaluated C.W. agree that her mental age is in the range of a three to five year old and that her I.Q. is in the range of 30 to a possible high of 50.
Perhaps the best indication of who C.W. is can be gleaned from her interaction with the trial judge, who saw her in the courtroom at the beginning of the hearings in this matter and who later interviewed C.W. privately in chambers, as required by Terwilliger. When C.W. was in the courtroqm, she was completely oblivious to what was happening around her. She reacted only when her name was spoken. She had with her a Sesa *431 me Street hand puppet, which she frequently waved at the judge. When interviewed, C.W. revealed a pleasant and affectionate nature. She hugged various people whom she had never before met. The trial judge described the session as follows:
[C.W.] concentrated primarily on a Walkman tape. She signed that she had brought her nephew, Ricky, into this world, that girls differ from boys in that women carry purses. In response to questioning, she signed, without differentiation, that she would like to have a baby, that she would also like to have a puppy, that babies can be bought in a store and that her brother and sister-in-law had bought her nephew, Ricky. When asked to write her name, she wrote her first name. She willingly hugged everyone in the room, including a male court clerk who was called in to test her response to an unknown male. She did not know the differences between male and female. When asked how “babies get in tummies,” she pointed to a necklace on a doll. She paid scant attention and drifted from any area on which the Court tried to focus her attention. She was able to write “dog” when shown a picture of the Judge’s puppy and was able to distinguish between statuettes of a dog and a rabbit. She was extremely suggestible, compliant and anxious to please. Her affect was that of an uncommunicative pre-school child. It would have been futile and well beyond her ken to have discussed reproduction and contraception with her.
Trial Court Opinion, at 5-6.
C.W.’s legal residence is with her mother at her home in Philadelphia. However, since C.W. was twelve she has lived in a community living arrangement (a “CLA”) operated by Ken Crest Centers, Inc. C.W. was placed in the CLA because she had become increasingly difficult to control at home, sometimes refusing to eat or take her medications and disrupting the rest of the family. Although at the time of the hearings in this matter C.W. lived in a CLA in which a total of five disabled persons lived, it would appear that she is now living with only two other people. Every other week, C.W. spends her weekend at her mother’s home. She also goes home for holidays. While there, she often visits her brother’s home.
At the time of the initial hearing, C.W. was attending a life skills program at Northeast High School and on alternate weeks she attended Swenson Skills Center. Dining these proceedings, however, she graduated from her high school program and was to begin working in a sheltered workshop for the mentally disabled. It is anticipated that, if sufficient funding is available, C.W. will continue to live in a CLA and go to the sheltered workshop.
In summary, C.W. has a mental age of between 3 and 5 and communicates on a minimal level. Her physical disabilities, including epilepsy, cerebral palsy and scoliosis, mean that she lives in a fragüe and unpredictable state.

REQUIRED PRELIMINARY FINDINGS Capacity of C.W. to Make a Decision About Sterilization

C.W.’s inability to make a decision concerning her own sterilization is beyond dispute. C.W. has no understanding of sexual or reproductive functions. As the trial judge noted, C.W. cannot identify the differences between men and women. All the experts who testified at the hearing and rendered an opinion on this subject stated that C.W. is not competent to given informed consent to a sterilization procedure or any other medical procedure, and never will be.

Reproductive Capability

Gynecological examination of C.W. revealed nothing that would indicate that she is incapable of reproduction. She has experienced normal development of her reproductive organs and has a regular menstrual cycle. Although C.W. has never been pregnant, all the experts qualified to express an opinion on this subject agreed that there was no reason to believe that C.W. was incapable of reproduction.

BEST INTEREST DETERMINATION

In analyzing the ultimate question of what is in C.W.’s best interest, we must consider, as did the trial court, the various factors enumerated in Terwilliger, in light of perti *432 nent information in the record. Several of the Terwilliger factors merit little discussion, since they are not subject to serious dispute.
First, addressing factor 2, the evidence squarely supports the trial court’s conclusion that C.W. might well experience severe, even life threatening, trauma were she to become pregnant. In contrast, the possibility of trauma or psychological damage resulting from the proposed tubal ligation is minimal. Expert testimony revealed that although the physical effect of a pregnancy on C.W.’s epileptic status was unknown, it might well be extremely damaging. Dr. Seitz, a board certified gynecologist, testified as follows regarding the various predictable effects of a pregnancy on C.W.:
[T]he old thought was a third of the patients with epilepsy becoming pregnant will experience more frequent seizures, a third will not be affected, and a third will actually improve.
Now, that’s the better end of the scale. There are other studies that show from 45 to 50 percent of epileptics will be more seizure prone during pregnancy.
... so I think there is a distinct possibility of aggravating the condition with pregnancy. Pregnancy I think would be extremely traumatizing emotionally....
I think a therapeutic interruption of the pregnancy could well be extremely traumatic as well as carry with it the usual complications of perforation and hemor-rage and infection,....
The other experts who testified on the question of the effect of a pregnancy on C.W., including Dr. Stembach, C.W.’s primary physician, and Dr. Bolognese, the impartial expert who testified at the trial court’s request, concurred in the view that pregnancy is highly inadvisable for C.W. The testimony revealed that certain of the medications C.W. takes, and without which she might well die, are known to cause congenital defects in a developing fetus. Moreover, C.W.’s epilepsy could cause a spontaneous abortion or premature birth. Even if C.W. carried the pregnancy to term, it might be inadvisable to allow her to experience labor and delivery, because of the time and medication involved. A caesarean section, which is a major operative procedure, would then have to be performed. Lastly, the testimony of Dr. Heller, a board certified psychiatrist, was to the effect that a pregnancy could be psychologically traumatic for C.W., particularly in the unlikely event that she could carry the pregnancy to term and would then have to be separated from the child due to her inability to care for it.
In contrast, the expert medical testimony revealed that performance of a tubal ligation would be a relatively non-traumatic event for C.W. C.W. would not comprehend the nature or effect of the procedure on her ability to procreate. Nor would her menstrual cycle or feelings of femininity be affected. Therefore, there would likely be no psychological damage or behavioral effect. Regarding the physical nature of the procedure, the experts agreed that it involves a very small incision and is customarily performed on an outpatient basis, following which the patient returns home and is back to normal within 72 hours. The small incision is made in the area of the navel and is regarded as a minor procedure. Because of C.W.’s other problems, her procedure would be done on an inpatient basis, but she would return home within a day or two after the procedure. The mortality rate is one to three in 100,000 and is generally related to the anesthetic.[5]
In sum, the record is clear that the risks and trauma associated with a pregnancy far outweigh the risks and trauma associated with a tubal ligation.
Second, addressing factor 4, the record overwhelmingly demonstrates that C.W. is incapable of understanding reproduction or contraception and that this situation is likely to be permanent.
Third, addressing factor 7, the record also overwhelmingly demonstrates that C.W. is incapable of caring for a child and that this *433 situation will not change. C.W.’s mental and physical disabilities render her substantially incapable of caring for herself, let alone another person.
Fourth, addressing factor 8, and despite appellant’s argument to the contrary, there is no evidence in the record that scientific or medical advances in the future will make possible a relevant improvement in C.W.’s own condition or that any relevant developments in sterilization techniques are imminent. The trial court explored this question fully and correctly found that there is no medical evidence that a cure for epilepsy is on the horizon, or that C.W.’s brain damage can ever be repaired. Nor was there any suggestion by any expert that medical science is on the brink of developing a new contraceptive or sterilization technique that would have a materially different effect on a person in C.W.’s difficult mental and physical condition. Dr. Bolognese specifically testified that he was not aware of any such medical advances.[6]
Lastly, addressing factor 9, the record strongly supports the trial court’s conclusion that C.W.’s mother is acting in the interest of C.W. alone in seeking permission to have her sterilized. C.W.’s mother revealed only the greatest concern and affection for her daughter. She testified that her only desire was to improve the quality of her daughter’s life and to protect her from any further pain. The trial court found the mother credible and found that she was not acting in her own interest.[7] We further emphasize that this is not a case where the spectre of eugenic sterilization, i.e. sterilization to prevent the birth of a “defective” child, is raised. Only C.W.’s own best interests are at issue.
We now proceed to consider the only two questions that are actually in dispute in this case in determining C.W.’s best interest. They are factor 3, the likelihood that C.W. will either voluntarily or involuntarily engage in sexual activity, and the overriding general requirement of Tenvilliger, i.e., that the procedure proposed is the only practicable means of contraception. It is on these two factors that the guardian ad litem has based her opposition to the performance of a tubal ligation on C.W. Simply stated, the guardian has argued that C.W. is constantly monitored and is not now nor will she ever be at risk of pregnancy. Moreover, the guardian has argued that even if a risk of pregnancy is perceived, other contraceptive measures are preferable. The guardian has suggested the use of education and training or the birth control pill or other hormonal treatment.
The guardian ad litem has emphasized that in this Commonwealth, services to the mentally retarded are governed by the closely related principles of normalization and least restrictive alternative. As described by James McFalls, Director of Residential Services at Ken Crest, who testified at these proceedings on behalf of the guardian ad litem, normalization requires that the environment provided to mentally retarded persons be as close as possible to the environment in which they would function if they had no handicap. The least restrictive alternative concept means that services are not provided to persons at a level that is more intensive or restrictive than is necessary for that person to live a normal life. These principles seek to preserve the rights of the mentally retarded to live full and meaningful lives and to grow and develop to their fullest potential, without unnecessary intrusion.
We recognize that these principles have been sanctioned in Pennsylvania. See In re Schmidt, 494 Pa. 86, 429 A.2d 631 (1981); Mental Health Procedures Act, 50 P.S. 7101 (Purdon 1976). Also, the holding in Terwilli-ger is consistent with these principles since Terwilliger requires that sterilization be ordered only when it is the only practicable *434 means of contraception, and farther requires that the procedure chosen is the least physically intrusive method available. The question presented to us is how these principles are to be implemented in C.W.’s life, specifically in connection with the issues of contraception and sterilization, so as to serve her overall best interests.
Extensive testimony was presented regarding the likelihood that C.W. will engage in sexual activity. There are actually two questions posed in this regard. First, would C.W. engage in sexual activity voluntarily. Second, could sexual activity be imposed upon her. In one sense, any sexual intercourse with C.W. would be essentially non-consensual, since it would appear that she is incompetent to give legally sufficient consent to sexual intercourse. Our reference to voluntary sexual activity is meant to refer to intercourse without force, that is, wherein C.W., for whatever reason, would not attempt to resist.
The record supports the trial court’s finding that C.W. might be willing to engage in voluntary sexual intercourse. There is no evidence that her sexual development has not proceeded normally. Furthermore, the record reveals she has an excessively affectionate nature and desires physical closeness. The record is full of references to C.W.’s affectionate nature. More than one witness testified that C.W. appears to crave physical contact with others, including strangers. During C.W.’s interview with the trial judge, she indiscriminately hugged the judge’s female law clerk and a male court employee C.W. had never seen before. During C.W.’s examination by Dr. Knast, a psychologist who evaluated her, she exposed her stomach to him and attempted to tickle his. Dr. Bolognese, the court appointed gynecologist who examined C.W., found her to be almost coquettish in demeanor.[8] The opinion of Ms. Lewin, a psychologist who examined C.W. at the behest of the guardian ad litem, was aptly summarized by the trial court as follows:
Ms. Lewin ... concluded that [C.W.] is not sexually active, has no awareness of sex, and her affectionate gestures are not indications of sexual interest_ Ms. Lewin noted that when she asked permission of [C.W.] to touch her crotch, [C.W.] signed “OK” and emphatically “Yes.” Ms. Lewin expressed her concern about [C.WJ’s vulnerability to being victimized and noted that the staff believes that if [C.W.] was left alone, she would go with anyone who was nice to her....
Ms. Lewin determined that [C.W.’s] sexual activity is limited to masturbation, that she understands the concept of masturbation and was able to demonstrate it. During a discussion of intercourse, [C.W.] gestured to Ms. Lewin that she engages in intercourse “all the time” and with every male she knows (her father, staff and CLA residents). She found that [C.W.] has an early adolescent awakening of feelings and fantasies, is keenly aware of her sexuality and femininity and uses both whenever possible, even where inappropriate. She engages in inappropriate touching, especially with strangers.
Trial Court Opinion, at 25-6.
The record also reveals that in mid-1989, when C.W. visited her primary physician, the physician’s notes include a reference, to a comment by the caretaker who brought C.W. to the appointment. The notes indicate that the caretaker stated that there had been “increased kissing involvement” between C.W. and her “boyfriend”. The record does not state who the boyfriend is or what C.W.’s precise relationship with him is.
Clearly, the picture of C.W. that emerges from this record is of a young woman who might voluntarily engage in sexual activity without comprehending the nature or possible impact of such activity. Moreover, the possibility of C.W. being victimized by sex forcibly being imposed on her is a true risk. The question therefore becomes: how likely is it, given the realities of C.W.’s living circumstances, that she actually would, either *435 voluntarily or by force, engage in sexual activity?
In answering this question, we must examine the various approaches to preventing C.W. from becoming pregnant which the guardian ad litem has proposed. She concludes that supervision and education and training will be effective. We have carefully reviewed the record to determine whether these approaches are or will be so effective that they will reduce the likelihood of C.W. engaging in sexual activity to a level that merits no further contraceptive measures in order to protect C.W. from the disastrous eventuality of pregnancy.
C.W. is presently closely supervised. She lives in a community living arrangement with other mentally impaired persons and a staff of several people. She is not permitted to leave the CLA alone. Because of her seizure disorder, she is checked every 15 to 30 minutes during the day. It appears from the record that she is not equally well supervised at night. One staff member at the CLA testified that only one staff member is on duty at night and that she is not located on the floor where C.W.’s room is. Also, that staff member is permitted to and sometimes does sleep during the night. Immediately prior to the first hearing in this matter, a small intercom box similar to that often used by people with young babies was placed in C.W.’s room so that staff could monitor noises from C.W.’s room while in other areas of the CLA.
When C.W. left the CLA to attend high school or the skills center, she went by school bus. The record is not clear as to how well supervised she was at the high school and skills center, nor is it at all clear what level of supervision will be provided at the sheltered workshop.
The testimony revealed that the 15 to 30 minute supervision provided C.W. when she is at the CLA is deemed medically necessary and is more than is given to other residents. The trial court heard a great deal of testimony as to whether this level of supervision was adequate to safeguard C.W. from pregnancy. The court concluded it was not and we find substantial support in the record for the court’s conclusion. The expert testimony was in conflict. Experts called by petitioner uniformly found this level of supervision inadequate, noting that much can be accomplished that can cause pregnancy in less than 15 minutes. Experts called by the guardian ad litem felt that the level of supervision was adequate, reducing the possibility of pregnancy to a very low level, although admittedly not eliminating it. Dr. Bolognese, called by the trial court, agreed with those who testified on behalf of the petitioner and was reluctant to conclude that supervision was sufficient to prevent C.W. from becoming pregnant.
The record does not support the guardian ad litem’s conclusion that C.W. is “never alone”. C.W. is sometimes alone. This record contains specific testimony regarding the fact that during the day C.W. is left alone in her room at her CLA for periods of 15 to 30 minutes and that in all likelihood at night she is left alone for considerably longer periods of time. C.W.’s mother testified that she initiated this proceeding because she was concerned that C.W. was not being supervised closely enough to protect her from the possibility of pregnancy. Her mother specifically related two incidents that gave rise to this concern. The first involved a situation where C.W. was on a picnic at Penn’s Landing with others from her CLA and was permitted to go to the public ladies’ room by herself. The second related to a time when C.W.’s mother was visiting the CLA and observed a young male resident of C.W.’s CLA standing in C.W.’s bedroom door watching C.W. undress.
The record also contains specific evidence of what has happened to C.W. when she was left alone. On one occasion, C.W. was in her room at the CLA. The staff person on duty was in the basement. She came up and heard a noise on the monitor coming from C.W.’s room. She then noticed the light in C.W.’s hall was out and saw a male resident of the CLA running from C.W.’s room. She went into C.W.’s room and found C.W. on her bed with her nightgown pulled up. C.W. was visibly upset and signed to the staff member that the male resident had touched her, *436 pointing to her breasts, waist and pubic area.[9]
In light of the above record evidence, we find the trial court was correct in rejecting the guardian ad litem’s argument and in concluding that the level of supervision that has been given to C.W. up to now, which has been deemed medically sufficient by all those who care for her, may well be insufficient to protect her from sexual activity.[10] Thus, if supervision is to be relied upon as the sole contraceptive device to be provided to C.W., the level of supervision will have to increase. C.W. could not be permitted to be alone and she could not have any degree of personal freedom. In such an environment she could not develop with the same freedom that she otherwise might have. Clearly, such an approach is extremely restrictive and rims completely contrary to principles of normalization and least restrictive alternative.
The guardian ad litem also argues that education and training, coupled with the present level of supervision, is adequate to protect C.W. from becoming pregnant. The record reveals that C.W.’s capacity for absorbing education and training is severely limited. C.W. has twice received education and training in the areas of behavior management, appropriate social interaction and sexuality, including the basics of reproduction and the difference between male and female bodies. Several years ago, C.W. was given “good touch — bad touch” training to assist her in protecting herself against physical abuse. By the time the trial court interviewed C.W. in 1988, she had completely forgotten these lessons. As we have previously indicated, she continued not only to be willing to have physical contact with strangers, but actually to seek it. She had not learned the difference between appropriate and inappropriate social behavior and could not indicate the differences between male and female bodies.
In 1989, during the pendency of these proceedings, training of C.W. in these areas was reinitiated. C.W.’s behavior had deteriorated. She had become uncooperative and engaged in self-abusive behavior such as biting and scratching herself. A behavior modification program was instituted. A sexuality consultant visited the CLA and provided training to the residents of the CLA once a month. Staff at the CLA reinforced these lessons in between the consultant’s visits. Specifically, C.W. was given a form of training called “Circles,” in which she was taught the appropriate manner of behaving with people who stood in various relationships to her, from stranger to friend to relative. The testimony at the hearings in 1989 indicated that C.W.’s behavior had improved and that she was retaining some of the information concerning appropriate social behavior.
Several of the experts who testified on behalf of the guardian ad litem stated their belief that C.W. is capable of learning the difference between appropriate and inappropriate social behavior. They opined that such training will render her less vulnerable to attack and less likely to engage in voluntary sexual activity.
Other experts were less sanguine. Dr. Heller, a psychiatrist called by the petitioner, did not believe that training would be effective in materially increasing C.W.’s cómpre- *437 hension of appropriate social behavior because her learning abilities are substantially impaired by irreversible neurological damage. Dr. Knast, another psychiatrist who testified for petitioner, found that C.W. has difficulty in understanding the consequences of behavior. Although Dr. Knast did not rule out some improvement in C.W.’s behavior and understanding, he opined that it would take at least two to three years for her to develop the communication skills necessary for behavior modification.
We have carefully considered the evidence concerning the effectiveness of educating C.W. and we concur in the trial court’s finding that education is not the answer. Even accepting that C.W.’s present training program has shown some results, it is simply a fact that no amount of training can protect C.W. from physical abuse. Moreover, from this record we cannot conclude with any degree of confidence that C.W., with her substantial neurological damage, can be educated not to engage in voluntary sexual activity, given her apparent natural desire to have physical contact with those around her. C.W., at the age of 20, could still only write her first name, could not be separated from her Kermit the Frog puppet, thought that babies could be purchased at the store and was willing to have physical contact with total strangers. The record reveals her ability to learn and retain information and to modify her behavior is very limited.
We also concur in the trial court’s recognition of the fact that no court can guarantee that education programs will be significantly effective to increase C.W.’s ability to understand and deal with sexuality or that even if there were such programs that they would be available to C.W. on an on-going basis. The record reveals that the programs C.W. has participated in have not markedly increased her capacity to learn and retain the information conveyed. She is now 24. She has lived in her CLA since she was 12 and, in all likelihood, she has been capable of reproduction for almost a decade. It is particularly telling that when the trial judge interviewed C.W., she was still completely incapable of comprehending anything about reproduction or sexuality or of controlling her own behavior.
Although the guardian ad litem opposed any medical means of contraception or sterilization, arguing that none of these options were at all necessary to eliminate the possibility of C.W. becoming pregnant, the guardian also argued that if a medical approach were deemed necessary, then methods short of tubal ligation were preferable. The medical options are: 1) barrier methods, such as an IUD or diaphragm; 2) hormonal treatments, such as Depo-Provera; 3) the birth control pill; and 4) tubal ligation.[11]
There was substantial agreement among the medical experts as to the relative advantages and disadvantages of each alternative.[12] In reviewing the testimony we have focused on the intrusiveness, risks and effectiveness of each alternative. In doing so, we have followed the dictates of Terwilliger. Terwil-liger requires that we choose the least intrusive approach, but also requires that we find that the method chosen is the only practicable means of contraception for the incompetent. Thus, the Terwilliger standard recognizes that the effectiveness of the method chosen is a legitimate concern. Further, we have evaluated the trial court’s conclusions regarding the medical risks posed to C.W. by each alternative.
Barrier methods were not recommended by any witness. Most such methods would require C.W. to be responsible for her own contraception, which is clearly beyond her capability. Any such method is impracticable in C.W.’s case. The IUD, which is placed by a physician, presents a risk of infection or perforation and must be replaced every year. *438 The risks posed by an IUD are too great, and the necessity of a medical procedure every year is too intrusive and may make it more intrusive than tubal ligation.
The sum and substance of the testimony of the experts regarding the hormonal treatments was that none of them have been widely enough used as contraceptive devices in this country for any expert to know what risks they might pose to C.W. given her substantial physical problems.
The third option is the birth control pill. The guardian ad litem has argued that if any medical contraception is deemed necessary, the pill should be given serious consideration. The guardian is correct that the pill is extremely effective, easily administered and requires no surgical procedure.
However, the guardian’s argument in favor of the pill as a method of contraception for C.W. rests largely upon a letter from C.W.’s neurologist, Dr. Elliott A. Schulman, to the guardian. While Dr. Schulman was not called to testify, this letter was admitted into evidence. The letter apparently responds to an inquiry the guardian had put to Dr. Schul-man, i.e., whether C.W. could receive general anesthesia in order to have a tubal ligation or whether she could be given the birth control pill. In the letter, Dr. Schulman states:
Some patients have increased seizure, frequency, others have decreased seizure frequency and some have no change while on birth control pills. This might be an option worth considering if you are hesitant putting her under general anesthesia.
The guardian ad litem considers this letter to be a statement by Dr. Schulman that the birth control pill is a “viable option” for C.W. Clearly, the guardian views Dr. Schulman as having endorsed the use of the birth control pill for C.W. The trial court did not agree. We find the more plausible interpretation of Dr. Schulman’s letter to be that he considered the pill an option despite its possible adverse effects on C.W.’s seizure problem if general anesthesia had to be ruled out because of its medical risks.
The experts who actually testified regarding giving the pill to C.W. unanimously opposed it. They cited the following possible difficulties:
1. The birth control pill is not administered to women over the age of 35 and, therefore, it is not even potentially a permanent contraceptive approach. Since it is not expected that C.W.’s condition will materially change, a potentially permanent solution is preferable.
2. The birth control pill can cause side effects in any woman. Some of these may indicate that more serious problems, like thromboembolic disease, are developing. If C.W. experiences such symptoms, she may not be capable of communicating that fact so as to enable the doctors to stop administering the pill or take other appropriate action.
3. Although the pill would be given to C.W. by her caretakers, if she refused to take her medications, as she has sometimes done in the past, the pill would be rendered totally ineffective.
4. The interaction of the pill with C.W.’s seizure medications is not known — use of the pill may require readjustment of those medications, which are already difficult to establish at levels sufficient to control C.W.’s seizures.
Giving due recognition to the fact that the pill is less physically intrusive than a tubal ligation, the trial court gave this option serious consideration but ultimately rejected it. The trial court’s conclusion that use of the birth control pill would not be in C.W.’s best interests is supported in the record. The well-considered opinions of the medical experts reveal that the experts were concerned with the possible effect of introducing another strong medication into the existing array of medications C.W. already takes every day. C.W.’s seizure disorder is just barely manageable as it is. Her two severe seizures in 1989 are stark evidence of that fact. The trial court concluded there was no reason to inject a new element that may further destabilize her, particularly where that element is unquestionably only a temporary solution to a problem that in all likelihood is permanent.
Next we assess the trial court’s conclusion that tubal ligation is in C.W.’s best interest. The testimony of Dr. Seitz and Dr. Bolog- *439 nese, both of whom are gynecologists and obstetricians with excellent qualifications and both of whom have performed hundreds of tubal ligations, described two types of tubal ligation, either of which could be performed on C.W.
Dr. Seitz recommended a mini-laparoscopy in which the fallopian tubes are cauterized in one section. The incision required is very small and postoperative discomfort is minimal. Most such procedures are done on an out-patient basis, although C.W. would have to be hospitalized to ensure that she is adequately medicated prior to surgery and to monitor her recovery thereafter. The risk of failure is one in 300 and the mortality rate is 3 in 100,000. There is no significant risk of complications. Most interestingly, the procedure is not permanent and, therefore, is not actually “sterilization” as that word has traditionally been understood. In eighty percent of the cases, this form of tubal ligation is reversible. The tubes are simply rejoined in a relatively minor surgical procedure.
Dr. Bolognese performs a different form of laparoscopic tubal ligation in which the fallopian tubes are cauterized at three locations. The recovery period and discomfort level is the same, and the failure rate is four in 1,000. Dr. Bolognese stated that if the procedure is done by an experienced practitioner, there is a minimal risk of complications. This procedure is not reversible, but neither does it interfere with a woman’s ability to conceive through in vitro fertilization.
The trial court’s conclusion that tubal ligation by laparoscopy is beyond any doubt the option that best serves C.W.’s medical and psychological interests is supported in the record. The procedure is not a dangerous operation and is not overly intrusive since it requires only a small incision into the area of the navel. It is extremely effective in contraception and it does not totally preclude C.W. from conceiving a child in the future in the very unlikely event that she is ever desirous or capable of having and caring for a child.[13] C.W. will not experience any reduction in her feelings of femininity or in her menstrual cycle. No psychological damage or behavioral modification is expected to result from the procedure since C.W. cannot comprehend the nature or effect of it on her ability to reproduce.
In determining the best interests of C.W., the trial court’s decision in favor of allowing a tubal ligation does not demonstrate an error of law or abuse of discretion. We have carefully examined the trial court’s findings and reasoning and are confident that all the information that is pertinent to the decision was before the trial court. In the end, the evidence demonstrates that despite the best efforts of all concerned to guard and educate C.W., the possibility of sexual activity and pregnancy does exist. That evidence also shows that no one can assess with precision how likely that eventuality is. The record is replete with the adverse impact of a pregnancy on C.W., and that pregnancy would be completely negative and perhaps even disastrous. Therefore, the trial judge was correct that C.W.’s best interests require that she be protected against that eventuality. Anything short of tubal ligation requires experimenting with various contraceptive medications that may cause her to experience more seizures, more pain and discomfort. When the alternative medical procedures are weighed against tubal ligation, a relatively simple and extremely effective procedure, the latter emerges as the best option.
The best interests of C.W. require that a guardian with authority to consent to tubal ligation be appointed.
The order of the trial court is affirmed.
McEWEN, J., concurs in the result.
JOHNSON, J., files a dissenting opinion.
*440 DEL SOLE, J., joins the dissenting opinion by JOHNSON, J.
HUDOCK, J., files a dissenting statement.

. While this case was pending on appeal, the Pennsylvania legislature enacted certain revi *428 sions to Title 20 (Decedents, Estates and Fiduciaries) of the Pennsylvania Consolidated Statutes. See, e.g., 20 Pa.C.S.A. § 5521 (1992). In part, these revisions relate to the appointment and powers of guardians of incapacitated persons. Although the revisions do not apply to the case before us, we note that the revisions do confirm the jurisdiction of the court of common pleas, including the Orphans' Division, over the appointment of guardians and require that the court grant specific authority to a guardian to consent to a sterilization of an incapacitated person.

. The jurisdiction of the court of common pleas to grant such relief is not at issue in this appeal.

. Amici curiae, Pennsylvania Protection & Advocacy, Association for Retarded Citizens — Pennsylvania, Association for Retarded Citizens — Allegheny County, American Civil Liberties Union of Greater Pittsburgh, and The Association for Persons with Severe Handicaps — Pennsylvania, argue that we should modify Terwilliger. Amici seek to have us require that no incompetent be sterilized unless the court has first found that there is clear and convincing evidence that the incompetent is already engaged in voluntary sexual activity. Amici urge that we eliminate all consideration of the likelihood that an incompetent who is not already engaging in voluntary sexual activity might do so in the future or of the likelihood that the incompetent may be sexually abused. This is in clear contravention of the Terwilliger standard, of which we fully approve, and would not be a salutary change in the law.

. As this recitation reveals, the trial court assiduously foEowed the procedural requirements of Terwilliger in its handling of this case. Neither party argues to the contrary.

. We discuss more fully the precise nature of a tubal ligation in a later section of this opinion where we consider in detail all of the various medical contraceptive and sterilization options available to C.W.

. The guardian ad litem makes much of the fact that during the pendency of this case hormonal contraceptives like Depo-Provera and Norplant have become generally available in this country. This, of course, is irrelevant to our consideration of this case, since there was testimony concerning these hormonal contraceptives at the hearings in this matter and that testimony, albeit scant, revealed that such treatments have not been widely enough employed for anyone to know what effect they might have on C.W.'s severe medical problems.

. We further note that C.W.’s father, who is now divorced from her mother, executed an affidavit in which he concurred in the mother’s petition.

. Interestingly, Dr. Bolognese's physical examination of C.W. also revealed that she does not have an intact hymen. This was a fact previously unknown to C.W.’s mother or, apparently, any other person involved in her care. The record does not reveal any reliable explanation for C.W.’s lack of an intact hymen.

. The guardian ad litem makes much of the alleged fact, which is based not on record evidence but rather on the representation of the guardian, that C.W. no longer lives with any male residents at her CLA. We do not find it appropriate to accord nearly the degree of significance to that fact as does the guardian. The absence of men living at C.W.’s CLA does not shield her from the possibility of contact with a man. Clearly there does not need to be a male residing in C.W.'s CLA for a man to be present there. Nor does anyone deny that C.W. may well come into contact with men at the home of her mother and other relatives, where she frequently visits, at her sheltered workshop, and at the social gatherings she sometimes attends.

. We reject the guardian ad litem's argument that the supervision level accorded to C.W. up to now has proven itself to be effective since there is no indication that C.W. has yet engaged in sexual activity. The fact is, no one knows whether she has engaged in sexual activity and, even if she has not, certainly no one knows whether she will in the future. Terwilliger does not require that we wait until there is actual proof of sexual activity before action is taken to protect the incompetent from it. Terwilliger requires that we assess, inter alia, the likelihood of sexual activity.

. The guardian ad litem also argued that abortion should be considered as a method of dealing with the eventuality of C.W. becoming pregnant. The guardian argued that a first trimester abortion would be only as physically intrusive as a tubal ligation. The trial court rejected this alternative, and we find no error in the court’s reasoning.

. All of these witnesses were called by either the petitioner or the trial court. The guardian ad litem did not call a doctor to contradict the medical testimony on this issue.

. Unlike the situation that appears to have been presented to the Terwilliger court, where the tubal ligation procedure proposed was irreversible and no alternative means of conception was possible for Ms. Terwilliger, we are not here presented with such a limited field of choices. The ten years since Terwilliger have seen the development of a highly reversible form of tubal ligation. In addition, even in the case of an irreversible tubal ligation, conception is not out of the question. Medical science has developed the in vitro fertilization procedure and is constantly perfecting new methods of enabling women to conceive despite severe damage to their fallopian tubes.